**FRANK C. MINVIELLE, L.L.C.**

v.

**IMC GLOBAL OPERATIONS, INC.**
Transok Inc. Encana Midstream,
Inc. Estis Well Service, L.L.C.

No. CIV.A.03–1908.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

Oct. 19, 2004.

Patricia E. Weeks, Weeks & Gonzalez, New Orleans, LA, Donald T. Carmouche, Talbot Carmouche et al. (Gonzales), John H. Carmouche, Talbot Carmouche et al (Gonzales), Gonzales, LA, John P. Gonzalez, Weeks & Gonzalez, New Orleans, LA, Robert C. Vines, New Iberia, LA, Victor L. Marcello, Talbot Carmouche et al. (Gonzales), Gonzales, LA, for Plaintiff.

Carl D. Rosenblum, R. Kevin Hamilton, Eric M. Whitaker, New Orleans, LA, Jeffrey M. Baudier, Jones Walker et al., Lafayette, LA, for Defendants.

## MEMORANDUM OPINION— RULING ON MOTIONS

### *(Rec. Docs. 19 and 89)*

METHVIN, United States Magistrate Judge.

Before the court are a number of motions to dismiss filed by defendant IMC Global Operations, Inc. ("IMC").[1] Plaintiff, Frank C. Minvielle, L.L.C. filed an opposition and IMC filed a reply.[2] Plaintiff submitted additional affidavits and defendant filed a motion to strike a portion of the affidavits.[3] Oral argument was held on July 22, 2004.[4]

### *Procedural Background*

Plaintiff, a limited liability company, filed suit on August 27, 2003, in the 16th Judicial District Court alleging that it owns real property and oil and gas leases in Iberia Parish, Louisiana, which have been "contaminated or otherwise damaged by defendants' oil and gas exploration and production activities."[5] Plaintiff named as defendants IMC, Encana Midstream, Inc., Estis Well Service, L.L.C., and Transok, Inc. The case was removed to federal on October 15, 2003 pursuant to diversity jurisdiction under 28 U.S.C. § 1332. Only one defendant remains in the case at this juncture: IMC.[6]

### *Factual Background*

The record shows as follows: On September 28, 1961, Juliet Bourgeois Delcambre, a previous owner of the land at issue, entered into an Oil, Gas and Mineral Lease (hereinafter referred to as the "1961 lease") with The Atlantic Refining Company ("ARCO") for the purposes of exploring and possibly drilling for oil on the property.[7] ARCO subleased the mineral rights to Callery Properties, Inc. on November 26, 1962.[8] Callery Properties, Inc., in turn, conveyed its interest in the lease to Petro–Lewis Funds, Inc. on November 26, 1974.[9] Petro–Lewis conducted operations on the property and on December 24, 1977 filed a "Plug and Abandon Report" related to the Delcambre # 1 Well (well serial no. 105992).[10] Plaintiff alleges that Petro–Lewis breached the contract and contami-

---

1. The motion is styled as if mover were McMoRan Exploration Company rather than defendant IMC. As the court observed in its ruling on the motion to remand, McMoRan has undertaken the defense of IMC in this suit, and its motion will be deemed on behalf of IMC. Encana also filed a motion to dismiss (Rec.Doc. 16), however, at oral argument held July 22, 2004, plaintiff's counsel advised that plaintiff was going to voluntarily dismiss Encana with prejudice, rendering Encana's motion moot. An order dismissing Encanca was issued August 16, 2004. Rec. Doc. 94.

2. Rec. Doc. 69, 72, and 73.

3. Rec. Doc. 89.

4. At oral argument, the court deferred ruling on the motion for summary judgment based on prescription; and on the Rule 12(b)(7) motion to dismiss for failure to join parties who retained a 1/2 % mineral interest in the property; for lack of standing, and for failure to state a claim for attorney's fees.

5. *See* Petition for Damages, Rec. Doc. 1, Paragraphs 1 and 3.

6. On February 2, 2002, Estis Well Service, L.L.C. was dismissed based on fraudulent joinder (Rec.Doc. 55). Defendant Transok, Inc., was dismissed on February 20, 2004 for plaintiff's failure to prosecute (Rec.Doc. 65). Finally, Encana was dismissed with prejudice on plaintiff's motion (Rec.Doc. 94).

7. Attachment to Rec. Doc. 69. On January 10, 1963, Juliet Delcambre Cowan, daughter of Juliet Bourgeois Delcambre, ratified the 1961 lease. *See* "Act of Ratification," attachment to Rec. Doc. 69.

8. "Sublease of Oil, Gas, and Mineral Leases," attachment to Rec. Doc. 69.

9. "Conveyance," attachment to Rec. Doc. 69.

10. "Plug and Abandon Report," attachment to Rec. Doc. 41.

nated the property during its operations. IMC is the successor of Petro–Lewis.

Plaintiff's predecessor, Minvielle & Segura, L.L.C. purchased the land in 1998 by Act of Cash Sale.[11] On November 30, 2001, Frank C. Minvielle acquired all ownership of Minvielle & Segura, L.L.C., and shortly thereafter changed its name to Frank C. Minvielle, L.L.C., plaintiff in this action.[12]

### Motions Presented

IMC filed the following motions:

(A) Rule 12(b)(1) Motion Requesting Deference to the Primary Concurrent Jurisdiction of the Louisiana Office of Conservation ("LOC") and the Louisiana Department of Environmental Quality ("DEQ");

(B) Rule 12(b)(1) and/or 12(b)(6) motion to dismiss premature claims;

(C) Rule 12(e) motion for more definite statement;

(D) Rule 12(b)(3) motion to dismiss for improper venue;

(E) Motion for compliance with Rule 20 and 21 regarding improper joinder;

(F) Rule 12(b)(7) motion dismiss for failure to join indispensable parties;

(G) Rule 12(b)(6) motion to dismiss for failure to state a claim for lack of standing, nonrecoverable damages, and prescription.[13]

On June 2, 2004, the 12(b)(6) motions (Paragraph (G) above) were converted to motions for summary judgment since their disposition required reference to documents outside of the complaint. The parties were allowed ten days to submit additional information to be considered in connection with the motion for summary judgment.[14] On June 14, 2004, plaintiff submitted the affidavit of Frank Minvielle, owner of plaintiff Frank C. Minvielle, L.L.C. Plaintiff subsequently filed the affidavits of Juliet and Finis Cowan, regarding the previous owners' knowledge of the condition of the land at issue.[15] Defendant filed a motion to strike the affidavits, maintaining that portions of the affidavits were not based on the personal knowledge of the affiants.[16] Plaintiff filed an opposition to the motion to strike and the parties filed supplemental briefs regarding prescription and indispensable parties.[17]

### Analysis

The district court, sitting in diversity jurisdiction, must apply the substantive law of Louisiana, while employing Federal procedural rules. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In the absence of a valid Federal Civil Rule addressing the point, the court must determine whether a particular rule is procedural or substantive by considering the "twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

### (A) *Rule 12(b)(1) motion for deference to the primary concurrent jurisdiction*

Plaintiff seeks damages for IMC's disposal, discharge, and storage of highly tox-

---

11. Exhibit 8 to Rec. Doc. 41.

12. Rec. Doc. 77

13. Rec. Doc. 19.

14. On June 14, 2004, plaintiff submitted the affidavit of Frank Minvielle, owner of plaintiff Frank C. Minvielle, L.L.C. Plaintiff subsequently filed the affidavits of Juliet and Finis

Cowan, regarding the previous owners' knowledge of the condition of the land at issue. The parties filed supplemental briefs regarding prescription.

15. Rec. Doc. 86.

16. Rec. Doc. 89.

17. Rec. Docs. 90, 92, 93, 96.

ic chemicals into plaintiff's property. Plaintiff also seeks funds to conduct a scientific analysis of the extent and nature of the contamination, the costs to restore the property, punitive damages, and attorneys' fees. IMC argues that all of the claims are subject to the primary concurrent jurisdiction of the Louisiana Office of Conservation ("LOC") and the Louisiana Department of Environmental Quality ("DEQ"), and that this court should allow those agencies to address the environmental remediation issues prior to judicial consideration of liability and damage issues.

Louisiana Revised Statute 30:1(D) provides that the LOC has jurisdiction over claims regarding: "the disposal of any waste product into the subsurface by means of a disposal well and the regulation of all surface and storage waste facilities incidental to oil and gas exploration and production, shall be within the jurisdiction of the department." The LOC also has jurisdiction over issues regarding surface and storage waste facilities incidental to oil and gas exploration and production and abandoned oil and gas wells. La. R.S. 30:4(C). The DEQ has jurisdiction over remedial action plans and has set forth a process by which remediation plans are approved and enforceable. La.R.S. 30:2286.1.

■■■■ Under Louisiana law, the deference to the commissioner for an initial decision on matters within the expertise of the LOC, which is contemplated by the doctrine of primary jurisdiction, is a matter within the sound discretion of the trial court. *Magnolia Coal Terminal v. Phillips Oil Co.,* 576 So.2d 475, 489 (La.1991). The two major considerations underlying the doctrine are the need for uniformity in various areas of regulated industry, and the special administrative expertise attributable to agencies due to their intimate working associations with industries they regulate. *South–West Utilities v. S. Cent.*

*Bell Tel.,* 339 So.2d 425 (1976). Louisiana's doctrine of primary jurisdiction is substantive and it requires the federal courts to exercise discretion as if it were a Louisiana state court. *Mills v. Davis Oil Co.,* 11 F.3d 1298, 1304–1304 (5th Cir. 1994).

■■■■ Landowners in Louisiana have no duty to seek relief from an administrative agency before filing suit against an oil company. *Corbello v. Iowa Production,* 850 So.2d 686 (La.2003). Plaintiff's action for damage to its property is a matter of private law. *Magnolia Coal Terminal v. Phillips Oil Co.,* 576 So.2d 475, 483 (La. 1991). In *Magnolia Coal,* the Louisiana Supreme Court upheld a trial court's decision, in deciding a remediation issue, refusing to defer to the Commissioner of Conservation as a matter of primary jurisdiction. The court stated that "damages from soil pollution are within the conventional knowledge and expertise of a trier of fact and the court of appeal erred in deciding that the plaintiff's damages cannot be fixed until the commissioner of conservation holds a new hearing." *Magnolia Coal,* 576 So.2d at 484.

Considering the applicable law, and the fact that plaintiff opposes it, the court concludes that preliminary submission of the claims to the LOC and DEQ is not necessary. Accordingly, the Rule 12(b)(1) motion for deference to the primary concurrent jurisdiction of the LOC and DEQ is **DENIED.**

**(B) and (C):** *Motion to dismiss premature claims, or for more definite statement*

### 1. *Prematurity involving LOC and DEQ*

IMC argues that plaintiff's claims are premature because plaintiff has not sought review with the LOC or DEQ, and there-

fore has failed to exhaust the administrative remedies. As discussed above, exhaustion of administrative remedies is not necessary. As discussed in *Corbello, supra*, landowners have no duty to seek relief from an administrative agency before filing suit against an oil company.

■ IMC asserts that claims under the Conservation Act for contamination of "usable ground water" must be made with the LOC and DEQ, pursuant to La. R.S. 30:1 and 30:2015.1 (requiring notification of DEQ in certain cases). Those statutes are inapplicable. Plaintiff has specifically stated that it does not seek redress for public issues, but instead has limited its claims to private causes of action. Louisiana Revised Statute 30:1 requires exhaustion prior to judicial review for claims by "a person aggrieved" by a law, rule, regulation or order made by the assistant secretary of the office of conservation. Plaintiff has not asserted that it has been aggrieved by an order of the LOC or DEQ, and is therefore not limited to a claim under La. R.S. 30:1.[18]

Nor is La.R.S. 30:14 applicable. The latter statute authorizes the Commissioner of Conservation to enjoin conduct in violation of state laws when "ongoing or threatened" actions violate conservation laws of the state. Plaintiff's claims are for purely private matters relating solely to the actions of the defendant oil companies.

Plaintiff has specifically excluded any claims for contamination of usable ground water and has otherwise avoided claims that trigger involvement by the Commissioner of Conservation. Accordingly, IMC's attempt to require administrative review by this landowner is without merit, and the motion to dismiss for prematurity is **DENIED.**[19]

### 2. *Prematurity under leases*

IMC contends that plaintiff was required to give defendants written notice of the alleged breach of contract and request that defendants correct the breach prior to filing this suit. IMC asserts that plaintiff's complaint is vague and omits specific facts identifying which leases have been allegedly breached by which defendant, the terms of the leases, the parties thereto, and the subject lands. IMC reasons that some of the leases at issue may not have been terminated yet, and therefore the present claims are premature.

A review of Exhibit "C" to plaintiff's opposition memorandum shows that IMC's predecessor, Petro–Lewis Funds, Inc. was involved with a lease that resulted in work done on plaintiff's land. Although plaintiff failed to specify, in its pleadings, the subject tract of land and whether the lease had expired, plaintiff's counsel addressed the issue at oral argument. The Petro–

---

**18.** La R.S. 30:1 provides:

A person who is aggrieved by any law of this state with respect to conservation of oil or gas, or both, or by a provision of this Chapter, or by a rule, regulation, or order made by the assistant secretary of the office of conservation hereunder, or by an act done or threatened hereunder, and who has exhausted his administrative remedy, may obtain court review by a suit for injunction or judicial review against the assistant secretary as defendant.

**19.** To the extent that plaintiff's complaint does mention in paragraphs 13, 16, 25, and

26 that defendant's activities have resulted in contamination of ground water, the court deems these references merely factual allegations. Since plaintiff specifically, in paragraph 31, asserts that it is not seeking damages for contamination or remediation costs for usable ground water, no such damages are recoverable due to the exclusion thereof by the complaint. In the event that plaintiff were to claim damages for contamination or remediation costs of usable ground water, La. R.S. 30:2015.1, requiring notification of DEQ, must be followed prior to assertion of any such claims.

Lewis lease involved the Delcambre Well No. 1, which was plugged and abandoned in 1977. By its own terms, the lease expired 90 days after production ceased. IMC conceded that the lease expired in 1977. Thus, the motion to dismiss for prematurity under the lease is **DENIED**.

#### (D) *Rule 12(b)(3) motion to dismiss for improper venue*

IMC maintains that:

To the extent that the plaintiff's claims must be brought against the LOC pursuant to La. R.S. 30:12(A)(2) as discussed in the motion to dismiss for prematurity raised above, the 19th Judicial District Court (and therefore the U.S. District Court for the Middle District of Louisiana) is the court of proper venue for the claims raised by plaintiff's Petition.

As discussed above, IMC's motion to dismiss for prematurity regarding the necessity to file suit against the Commissioner of Conservation is without merit. Accordingly, the motion to dismiss for lack of venue based on the same arguments is **DENIED**.

#### (E) *Motion for compliance with Rule 20 and 21 regarding improper joinder*

IMC maintains that plaintiff improperly joined the defendants in this action. Since all other defendants have now been dismissed, this motion is **DENIED** as moot.

#### (F) *Rule 12(b)(7) motion dismiss for failure to join indispensable parties*

IMC argues that there may be other parties which need to be added, either as defendants or plaintiffs. Plaintiff argues that there are no other parties which need to be joined.

At oral argument, the court noted that the sellers retained a 1/2 percent mineral interest in the land sold to plaintiff. The Act of Cash Sale states:

Sellers reserve and retain unto themselves, their heirs, successors and assigns, an undivided 1/2 [percent] of all oil, gas, and other minerals, including sulphur, in, on and under the aforedescribed property with the right and authority to exercise all necessary means for the prospecting, exploiting, producing and development of the minerals, including all rights of access to and use of the surface of the land as may be necessary or incident to this reservation.[20]

Rule 19(a) F.R.Civ. P. states that parties are necessary to an action if: "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."

 The Cowans do not own the land in question. The record indicates they are aware of this action and have not attempted to state an interest, nor have any other indispensable parties been identified. The motion to dismiss for failure to join necessary parties is therefore **DENIED**.

#### (G) *Rule 12(b)(6) Motion to Dismiss— Converted to Motion for Summary Judgment*

IMC filed a motion to dismiss for failure to state a claim. Since the parties filed

---

**20.** Exhibit 8 to Rec. Doc. 41.

matters outside of the pleadings which must be considered in order to determine the motion, the court notified the parties that the motion would be considered a motion for summary judgment under Rule 56. F.R. C.P. 12(b). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.56. An issue is material if its resolution could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a fact issue has been created, the court must view the facts and the inferences in the light most favorable to the nonmoving party. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir.1999).

### 1. Prescription

#### a. Contra Non Valentum

■ Plaintiff concedes that the complaint was filed over twenty years after the alleged breach of contract and tortious conduct by defendants. Considering that tort claims prescribe one year after the date of the alleged tortious conduct, and that contractual claims prescribe ten years after the alleged breach, the claims arising from defendants' actions on plaintiff's property were prescribed on the face of the petition. Accordingly, the burden to establish an exception to the rule of prescription lies with plaintiff. *Terrebonne Parish School Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 885–886 (5th Cir.2002). The plaintiff is required to adduce evidence sufficient to raise a genuine issue of material fact regarding its claim of an exception from prescription. Mere allegation or innuendo is insufficient.

■ Plaintiff relies on the theory of *contra non valentum* to avoid prescription barring the claims in this case. According to this theory, prescription does not begin to run until "a plaintiff either knew or should have known of a cause of action, even if that knowledge does not occur until long after the wrongful conduct at issue has occurred." *Simmons v. Templeton*, 723 So.2d 1009, 1012 (1998). Prescription runs from the time that the plaintiff has actual or constructive knowledge of the act, which has been defined as "the time at which the plaintiff has information sufficient to excite attention and prompt further inquiry." *National Council on Compensation Ins. v. Quixx Temporary Serv., Inc.*, 665 So.2d 120, 124 (1995). Thus, prescription does not begin to run at the first indication that the plaintiff may have suffered harm, but rather it begins to run "when plaintiff has reasonable basis to pursue claim against specific defendant." *Jordan v. Employee Transfer Corp.*, 509 So.2d 420, 424 (La.1987). The heart of the inquiry into constructive knowledge is the reasonableness of plaintiff's inaction. *Id.*

Plaintiff submitted the affidavit of Frank Minvielle, owner of plaintiff Frank C. Minvielle, L.L.C., which states that he did not have knowledge of a claim or reason to suspect that a claim existed until August 2003, when a geologist issued a report discussing possible contamination of plaintiff's property.

IMC does not contest that plaintiff did not have knowledge regarding the alleged contamination until just prior to the filing of suit. Plaintiff did not purchase the land until 1998, well after the alleged tortious conduct occurred. However, the claims may be prescribed if the previous owners of the land knew or should have known of the possible claims. If they did not, then under the doctrine of *contra non valen-*

*tum,* prescription only began to run when plaintiff learned of the potential claims.

In response to the order setting oral argument, plaintiff submitted the affidavits of Finis E. Cowan, Jr. and Juliet D. Cowan. The Cowans are married and Mrs. Cowan's mother, Mrs. Juliet Delcambre, owned the land at issue until her death in 1988, at which time the land passed to Mrs. Cowan and her children.[21] Mr. Cowan explained that in 1982, PanCanadian Petroleum, Encana's predecessor, paid Mrs. Delcambre $21,000.00 for possible contamination from its operations.[22] With regard to IMC's predecessor Petro–Lewis's oilfield operations, Mr. Cowan states, "I have never had any information that would lead me to know or believe that there was any contamination problems at the Petro Lewis site." Mrs. Cowan states, "I have reviewed the above affidavit and discussed it with my husband. To the best of my knowledge the statements contained in his affidavit are true and correct."[23]

IMC argues that the affidavits of the Cowans are insufficient to defeat the motion for summary judgment.[24] IMC maintains that the Cowans' affidavits were not based on personal knowledge regarding what the pre–1988 owners knew. Mrs. Cowan inherited the land from her mother in 1988. Additionally, IMC argues that since the Cowans' affidavits contain language evidencing that they did not know where the Petro Lewis well was located, they could not provide information based upon personal knowledge regarding possible contamination at the site.

The court concludes that the affidavits of the Cowens establish that prior to selling the property to plaintiff, they did not know of any contamination, nor was there any indication that the property may have been contaminated by Petro–Lewis. IMC's argument that the Cowans did not have personal knowledge regarding the facts relating to the Petro–Lewis well is unpersuasive. The Cowans attest that they had no information regarding possible contamination or claims against Petro–Lewis, and no reason to believe that there was any contamination or other problems with the land prior to it being sold to plaintiff. Their lack of knowledge is explained by their further assertions that they were far removed from the operations and did not even know the exact location of the well. The Cowans state that they relied upon the oilfield companies to perform their work according to the leases. Thus, absent some affirmative communication from a company, such as PanCanadian's statement to the landowners that it had contaminated the site, there was no reason to believe that the companies operating on the land were doing so in a deficient manner. Moreover, since the owner of the land prior to 1988, Mrs. Delcambre, is deceased, it would be virtually impossible for plaintiff to establish Mrs. Delcambre's knowledge regarding the land without relying upon the affidavits of the Cowans, from whom Mrs. Delcambre sought advice on issues concerning the land. It is clear that the Cowans did not know of contamination, nor do they have reason to believe that Mrs. Delcambre had any such knowledge. IMC concedes that the Cowans are testifying truthfully in their affidavits.

 Considering the foregoing, the court concludes that no one had reason to believe that there was a problem with the land prior to the 2003 geologist's report indicating possible contamination. The doctrine of *contra non valentum* therefore

---

**21.** Rec. Doc. 86.

**22.** Rec. Doc. 86.

**23.** Rec. Doc. 86

**24.** Rec. Doc. 89.

suspended the running of prescription until plaintiff had knowledge of the claims shortly before filing suit. IMC's motion for summary judgment is therefore **DENIED**. Additionally, IMC's motion to strike the affidavits of the Cowans is **DENIED**.

### b. Continuing tort

■■■■ The doctrine of continuing tort presents an exception to the one-year prescriptive period. "A continuing tort is occasioned by [the continual] unlawful acts, not the continuation of the ill effects of an original, wrongful act." *Crump v. Sabine River Authority*, 737 So.2d 720, 728 (1999).[25] Addressing the requirement that there be continuous conduct by the defendant, the Louisiana Supreme Court stated that "[t]he continuous conduct contemplated in a continuing tort must be tortious and must be the operating cause of the injury." *Id.* at 729 n. 7. In *Crump*, the Louisiana Supreme Court rejected the contention that a continuing breach of duty could consist of a defendant's failure to remedy the harm caused by the initial tortious conduct, stating that "the breach of the duty to right the wrong and make the plaintiff whole simply cannot be a continuing wrong which suspends the running of prescription, as that is the purpose of any lawsuit and the obligation of every tortfeasor." *Id.* at 729.

■■■■ The Louisiana Supreme Court summarized the doctrine of continuing tort as it applies in Louisiana property law cases as follows:

When a defendant's damage-causing act is completed, the existence of continuing damages to the plaintiff, even progressively worsening damages, does not present successive causes of action accruing because of a continuing tort. *Derbofen v. T.L. James & Co.*, 355 So.2d 963 (1977), *writs denied*, 357 So.2d 1168, *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 257 (1978).

*In re Moses*, 788 So.2d 1173, 1183 (La. 2001). The practical rule adopted by Louisiana courts in property damage cases is that prescription begins to run when the continuous tortious conduct is abated.

The case law distinguishes between ongoing causes and tortious conduct that has ceased. In cases such as *Patout*, where landfill waste was deposited onto plaintiff's property via trespass, and *South Central Bell*, where gas tanks continued to leak, the ongoing cause was the failure of the defendants to remove the damage causing structure. *Estate of Patout v. City of New Iberia*, 708 So.2d 526 (1998); *South Central Bell Telephone Co. v. Texaco, Inc.*, 418 So.2d 531 (La.1982). In *South Central Bell*, leaking underground storage tanks caused continuous damages to plaintiff's underground telephone wires. Because both the conduct-the leaking—and the damages continued, the tort was held to be a continuous.

In *Mouton v. State of Louisiana*, 525 So.2d 1136 (La.App. 1st Cir.1988), however, disposal of waste in the ground was not a continuing tort. The court held that the tortious conduct was the dumping of waste onto plaintiff's property and, since it occurred beyond the one year prescriptive period, the action had prescribed. Similarly, in *Badalamenti v. Chevron Chemical Co.*, 1995 WL 386868, *2 (E.D.La.1995), the court found that the tortious conduct at issue was the disposal of waste onto plaintiff's property. The operating cause of plaintiff's injury did not continue beyond

---

**25.** Although the decision regarding *contra non valentum* defeats the motion for summary judgment on prescription at this time, the argument concerning the continuing tort doctrine will be addressed since there is a possibility that a fact finder will find that the doctrine of *contra non valentum* is inapplicable to the case.

the placement of the waste in the ground, and therefore, defendant's alleged conduct did not constitute a continuing tort because there was no ongoing cause. Likewise in *Terrebonne Parish School Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 885 –886 (5th Cir.2002), the Fifth Circuit upheld the district court's finding that the continuing tort doctrine was inapplicable. In *Terrebonne v. Mobil*, pursuant to a mineral lease, the defendant dredged a canal during its oil operations. After completion of the operations, the defendant left the canal intact. Plaintiff sued, 40 years later, arguing that the existence of the canal contributed to erosion of its land and the demise of the marshland habitat. The Fifth Circuit found that the unlawful conduct was not continuing because the completed well was abandoned with the canal left intact in 1959. Thus, even though the damage, i.e. the erosion, may have been continuing, the continuing tort doctrine was inapplicable because there was no continuing cause.

■ Here, like *Mouton*, the tortious conduct was the disposal of waste into plaintiff's property. The operating cause of plaintiff's injury was the actual disposal or storage of the oilfield waste in plaintiff's property. The conduct abated when the defendant's ceased operations, which was in excess of 20 years ago. Simply because the damages brought about by such conduct may have continued, that is insufficient to support application of the continuing tort doctrine. Accordingly, the continuing tort doctrine is inapplicable to the case at bar.

### 2. Lack of standing

Plaintiff seeks damages based on IMC's breach of the 1961 lease and for IMC's tortious conduct. IMC argues that since plaintiff was not a party to the contract and the previous owners' rights under the 1961 lease were not specifically assigned to plaintiff, plaintiff lacks standing to bring

the breach of contract claims. Moreover, IMC maintains that since the tortious conduct occurred prior to plaintiff owning the property, it cannot assert tort claims for damages. Plaintiff maintains that it has standing because it is a third party beneficiary of the contract and because tort damages can be brought regardless of the timing of the damages.

### a. Contractual claims

■ Actions arising from a breach of contract or lease of property are classified as involving personal rights rather than real rights. *Prados v. South Central Bell Tel. Co.*, 329 So.2d 744, 749 (La.1975), *citing Leonard v. Lavigne*, 245 La. 1004, 162 So.2d 341 (1964); *Harwood Oil and Mining Co. v. Black*, 240 La. 641, 124 So.2d 764 (1960) *overruled on other grounds by Salvex, Inc. v. Lewis*, 546 So.2d 1309 (La. App. 3d Cir.1989); 2 A. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE—PROPERTY, s 95, pp. 275—278 (1st Ed.1967). Real rights and obligations transfer from the seller to the buyer without any special provision. La.Civ.Code art. 1763. Personal rights, however, do not transfer in the absence of a special assignment of rights to the buyer. La.Civ.Code art. 1764. Official Comment (d) of article 1764 states that, "a particular successor does not acquire, without stipulation to that effect, any personal rights that his author has with respect to the thing."

■ There is no dispute that plaintiff has no direct privity of contract with IMC, nor does plaintiff allege that it obtained any assignment of rights in the the Act of Sale from the previous owners, other than warranty of title. The Act of Sale provides:

> ...Sellers, who, for the price and on the terms and conditions hereafter expressed hereby sell, assign, transfer and deliver with all legal warranties and with

full substitution and subrogation in and to all the rights and actions of warranty which Sellers have or may have against all preceding owners and vendors unto ... Purchaser.[26]

Such a subrogation clause applies only to warranty of title and does not assign personal rights for damages arising from previous leases involving the property. *Prados, supra,* 329 So.2d 744, 749 (La.1975).

Plaintiff argues, rather, that it is a third-party beneficiary of a "stipulation *pour autri*" contained in the the contract between the earlier landowners and IMC's predecessor. La.Civ.Code Ann. art 1978 provides as follows:

**Art.1978. Stipulation for a third party**

A contracting party may stipulate a benefit for a third person called a third party beneficiary.

Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary's agreement.

Comment (b) to Art.1978 states that "the beneficiary's intention to accept the benefit may be made known in any manner, even implied." Thus, by simply filing suit, plaintiff has made known its intention to accept the benefit, if it exists.

The specific language of the contract in question determines whether a stipulation *pour autrui* has been created. The Fifth Circuit has observed the necessity of clarity in any contractual provision intended to contain a stipulation *pour autrui:.*

... [S]uch a promise, or a stipulation *pour autrui,* "is never presumed. Rather, the intent of the contracting parties to stipulate a benefit in favor of a third party must be made manifestly clear." *Homer Nat'l Bank v. Tri–District Dev. Corp.,* 534 So.2d 154, 156 (La.App. 3d

Cir.1988), *writ denied,* 536 So.2d 1236 (La.1989). As we stated in *New Orleans Public Service, Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452 (5th Cir.) *(en banc), cert. denied sub nom. Morial v. United Gas Pipe Line Co.,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984):

Louisiana law is settled that for there to be a stipulation *pour autrui* there must be not only a third-party advantage, but the benefit derived from the contract by the third party may not merely be incidental to the contract. Rather, the third-party benefit must form the condition or consideration of the contract in order for it to be a stipulation *pour autrui.* Moreover, a stipulation *pour autrui* will be found only when the contract clearly contemplates the benefit to the third person as its condition or consideration. 732 F.2d at 467 (internal quotations and citations omitted).

*Chevron U.S.A., Inc. v. Traillour Oil Co.,* 987 F.2d 1138, 1147 (5th Cir.1993).

Plaintiff relies on *Hazelwood Farm, Inc. v. Liberty Oil & Gas Corp.,* 790 So.2d 93 (La.App. 3rd Cir.2001), *writ denied,* 794 So.2d 834, *writ denied,* 794 So.2d 836 (2001). In *Hazelwood,* the defendant had conducted oil and gas exploration and production activities pursuant to a contract with a previous landowner. After purchasing the property, Hazelwood filed suit alleging that the defendants' activities resulted in contamination of the property. Defendant Gulf/Chevron asserted that Hazelwood was not a party to the lease and therefore could not bring an action for the breach of the lease. The court found, however, that Hazelwood was the beneficiary of a stipulation *pour autrui. Id.* at 100, *citing* La.Civ.Code art.1978. The

**26.** Exhibit 8 to Rec. Doc. 41.

court noted that several factors are considered in determining whether a contract provides for a stipulation *pour autrui.* *Id.citing Andrepont v. Acadia Drilling Co.,* 231 So.2d 347, 351, 255 La. 347 (1969).[27] The court looked to the language in the lease, which provided that "Grantee shall be responsible for all damages caused by his operations." The court found that this language was similar to the relevant phrase in the *Andrepont* lease: "The Lessee shall be responsible for all damages caused by Lessee's operations." The latter lease had been found to create a stipulation *pour autrui,* and accordingly, the *Hazelwood* court concluded that the language in the lease must be interpreted as providing a stipulation *pour autrui* in favor of Hazelwood.

In *Andrepont supra,* the landowner allowed Andrepont to farm soybeans on a 35–acre tract in return for twenty percent of his crop. Later, the land and mineral owners of the tract executed an oil and gas lease allowing the lessee to enter the land to explore and produce oil, gas, and other minerals. The oil company's operations on the tract were detrimental to Andrepont's soybean crop:

> * * * [D]uring July, the oil and gas lessee entered upon the land, built a board road across Andrepont's field, dug waste pits and proceeded to drill a well in search of minerals. Construction of the road, the drill site and pits destroyed part of the crop and impaired drainage in the remainder of the soybean field. The lack of adequate drainage left water standing in the field and

made it impracticable to work the crop. As a result, the remainder of Andrepont's crop was damaged by 'scalding' and excessive weeds.

*Andrepont,* 255 La. 347, 231 So.2d 347, 353–54. The Louisiana Supreme Court examined the lease form, which initially read, "The Lessee shall be responsible for all damages to timber and growing crops of the Lessor caused by Lessee's operations." *Id.* at 351. The phrase "to timber and growing crops of Lessor" was then deleted so that the lease read, "The Lessee shall be responsible for all damages caused by Lessee's operations." *Id.* The Court found that this language created a stipulation *pour autrui.* The court wrote:

> "[Andrepont] is seeking to enforce a benefit stipulated in his favor by the landowner lessor as a condition of a commutative contract between the landowner lessor and the oil and gas lessee. Defendants, as assignees of the oil and gas lessee, are, therefore, parties to the contract in which the stipulation is a condition. . . ."

*Id.* at 356, 231 So.2d 347. The court reasoned that Andrepont had a direct right of action against the lessee to recover his damages as beneficiary of the stipulation.

In *Hargroder v. Columbia Gulf Transmission Co.,* 290 So.2d 874, 876 (La.1974), the court found that a stipulation *pour autrui* was created by language in a servitude agreement providing that defendant "agrees to pay such damages which may arise to growing crops, timber, or fences from the construction of the [pipeline]."

---

**27.** The factors are: "(1) The existence of a legal relationship between the promisee and the third person involving an obligation owed by the promisee to the beneficiary which performance of the promise will discharge; (2) the existence of a factual relationship between the promisee and the third person, where (a) there is a possibility of future liability either personal or real on the part of the promisee to the beneficiary against which performance of the promise (sic) will protect the former; (b) securing an advantage for the third person may beneficially affect the promisee in a material way; (c) there are ties of kinship or other circumstances indicating that a benefit by way of gratuity was intended." *Andrepont,* 231 So.2d at 351.

An examination of the lease in question shows that the language contained therein is materially distinguishable from that presented in *Hazelwood* and *Andrepont*, and *Hargroder*. Unlike the open-ended provisions in *Hazelwood* and *Andrepont*—"the lessee shall be responsible for all damages"—the lease here contemplates damages only "to Lessor and Lessor's tenants." The relevant provision of the 1961 lease *sub judice* reads as follows:

> Lessee shall promptly pay Lessor and Lessor's tenants a reasonable sum for any damage resulting to said premises or the crops or improvements thereon which may be caused by or result from the operations of Lessee hereunder. Within ninety (90) days after the cessation of drilling operations on any well located on the leased premises, Lessee, or its successors and assigns, shall fill and level all slush pits and shall remove the drilling equipment and material used in connection therewith from the drill site and shall restore said drill site to substantially its prior condition, so far as can reasonably be done, as concerns any material change in the surface of such premises caused by or resulting from operations of Lessee hereunder.

Although the second sentence requiring restoration of the property seems to impose a general obligation of restoration, the provision must be read as a whole. The only provision which discusses a right to damages is limited to damages payable to "Lessor and Lessor's tenants." Under Louisiana case law, such language does not create a stipulation *pour autrui* in favor of plaintiff. In *Broussard v. Northcott Exploration Co., Inc.*, 481 So.2d 125, 127 (La.1986), the court found that no stipulation *pour autri* was created by a clause stating, "The Lessee shall be responsible for all surface damages of the Lessor caused by the Lessee's operations" because the language was restricted to damages suffered by the lessor. The court held that the intent of the parties was key in determining whether a stipulation *pour autrui* is created. *Id.*, 481 So.2d at 127. A later court cited *Broussard* in concluding that no stipulation *pour autrui* arises in the absence of a clear intention to benefit future surface owners:

> Even viewing the clause as a possible stipulation *pour autrui* (stipulation for benefit of a third party), the result would be the same. *Broussard v. Northcott Exploration Company, Inc.*, 481 So.2d 125 (La.1986); *Hargroder v. Columbia Gulf Transmission Co.*, 290 So.2d 874 (La.1974); *Andrepont v. Acadia Drilling Co.*, 255 La. 347, 231 So.2d 347 (1969). The test annunciated in *Broussard* states that "[i]n order to determine if a stipulation [pour autrui] exists, we must look to the intention of the parties at the time the mineral lease was negotiated." Since the foregoing analysis indicates no such intention to benefit future surface owners, there was no stipulation *pour autrui* in favor of plaintiffs in this case.

*Ashby v. IMC Exploration Co.*, 506 So.2d 1193, 1196 n. 7 (La.1987).

In *Prados, supra*, 329 So.2d at 751, a land owner granted a lease to South Central Bell Telephone Company, allowing it to erect buildings and other structures on the land. The lease required the company to remove the structures at the completion of the lease. Upon termination of the lease, South Central Bell did not remove the structures, nor did the owner require removal. Several months later, the property was sold to Prados. After acquiring the property, Prados demanded that South Central Bell remove the structures. The company refused and Prados filed suit for damages representing the cost of clearing the property. South Central Bell challenged Prados's standing to bring suit based upon a breach of a former lessee's

obligation to restore the property at the termination of the lease. Noting that predial leases[28] involve personal rights, the Louisiana Supreme Court found that the right to damages was a personal right that accrued to the lessor prior to the sale of the property to Prados. Thus, the court looked to the act of sale to determine whether the right to damages was specifically assigned by the previous owner to Prados. The act of sale stipulated:

> ... she (Mrs. Ester Binford Prados) does by these presents, grant, bargain, sell, convey, transfer, assign and set over with full guarantee against all mortgages, liens, claims, evictions, or other encumbrances or alienations whatsoever, and with subrogations to all her rights and actions of warranty against all previous owners, and with full guarantee of title, unto JAMES L. PRADOS.

The court found that the act of sale made no reference to the expired lease, nor to the right of the seller to a restoration of the property to its original state, nor to the right of damages. The subrogation clause was directed only to actions of warranty against previous owners and did not include an assignment of the right to damages.

The court next determined that no right to damages from breach of contract could attach to the property itself, relying on the rule that "a purchaser cannot recover from a third party for damage to the property incurred prior to the sale." *Id.* at 750, citing *Gumbel v. New Orleans Terminal Co.,* 197 La. 439, 1 So.2d 686 (1941) *overruled on other grounds Lake, Inc. v. L P & L Co.,* 330 So.2d 914 (1976); *Taylor v. New Orleans Terminal Co.,* 126 La. 420, 52 So. 562 (1910); *McCutchen v. Texas & P. Ry. Co.,* 118 La. 436, 43 So. 42 (1907); *Bradford v. Richard, et al.,* 46 La.Ann.

1530, 16 So. 487 (1894); *Clark v. Warner,* 6 La.Ann. 408 (1851). The court stated, "The general principle, we think, is that a buyer is presumed to know the overt condition of the property and to take that condition into account in agreeing to the sales price." *Id.* at 751. Accordingly, the court held that Prados did not receive the right to recover damages against the former lessee via the act of sale or by virtue of purchasing the property.

Considering the foregoing, the court concludes that plaintiff did not receive an assignment of rights from the previous owner, nor did the 1961 lease create a stipulation *pour autrui* in favor of plaintiff. Thus, plaintiff does not have standing to bring contractual claims arising from the 1961 lease. Accordingly, the motion for summary judgment based on lack of standing to bring contractual claims is **GRANTED.**

### b. Tort claims

 Under Louisiana jurisprudence, the owner of land at the time of the alleged damages is the person with the real and actual interest to assert a claim for damages to the land; thus, a subsequent landowner does not have standing to assert tort claims for damage to property occurring prior to the landowner's acquisition of the land. *Gumbel v. New Orleans Terminal Co.,* 197 La. 439, 1 So.2d 686 (La.1941) *overruled on other grounds Lake, Inc. v. L P & L Co.,* 330 So.2d 914 (La.1976); *St. Jude Medical Office Building Limited Partnership v. City Glass and Mirror,* 619 So.2d 529, 530 (La.1993); *Dorvin Land Corp. v. Parish of Jefferson,* 469 So.2d 1011 (1985).

Plaintiff argues that "Louisiana law is now well settled that with regard to claims

---

**28.** Louisiana civil law uses the terms "predial and personal servitude" instead of the term "easement" when classifying lands.

to damage to immovables, whether the damage at issue occurred prior to plaintiffs' acquisition of the subject property is immaterial."[29] In support of this proposition, plaintiff cites three cases, two of which deal with contract claims, not tort. *See Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp.*, 844 So.2d 380 (2003) (plaintiff had standing to bring contract claims because it was beneficiary of a stipulation *pour autri*); *Magnolia Coal Terminal v. Phillips Oil Co.*, 576 So.2d 475 (La.1991) (standing not addressed as the lease was still in effect at time plaintiff purchased the land).

The third case relied upon by plaintiff is not instructive on the issue presented here. In *Hopewell, Inc. v. Mobil Oil Co.*, 770 So.2d 874, 875–876 (2000), defendant's predecessor had engaged in oilfield operations on the subject land pursuant to a lease.[30] Subsequently, Hopewell bought the property. Hopewell filed a petition for damages alleging that the oil and gas operations had resulted in the deposit of hazardous and toxic wastes on the property. Hopewell argued that Mobil had a duty to restore the property, and that the duty extended to a subsequent landowner. Mobil asserted an exception of no right of action, which the trial court denied. The appellate court reversed, finding that because Hopewell had purchased the land after the damages had occurred, it did not have a right of action. *Hopewell*, 770 So.2d at 879. The Louisiana Supreme Court reversed the appellate court, but its reasoning was not entirely clear. The court wrote:

Judgment of the Court of Appeal is reversed. Judgment of the trial court denying defendant's exception of no right of action is reinstated. *Prados v. South Central Bell Telephone Company*, 329 So.2d 744 (La.1975) (on rehearing), which the Court of Appeal relied upon, involves rights arising under a lease and is distinguishable from the instant facts. Case remanded to the trial court for further proceedings.

*Hopewell, Inc. v. Mobil Oil Co.*, 784 So.2d 653, (La.2001).

Although plaintiff characterizes the *Hopewell* decision as one of "brevity and clarity," the court agrees only with the "brevity" part. The only thing clear about the decision is that the court did not, by its brief reversal, establish a new legal principle. If that had been the court's intent, it easily could have said so in plain terms— i.e. that it was conferring standing upon subsequent landowners to assert tort claims for property damage occurring prior to their acquisition of the land. Nor did the decision alter the rule in Louisiana that the landowner at the time of the alleged damages is the person with the real and actual interest to assert a tort claim involving the property under *Gumbel* and *Dorvin*.

The law in Louisiana remains that the owner of land at the time of the alleged damages is the person with the real and actual interest to assert the claim for dam-

---

29. Rec. Doc. 69 at p. 10.

30. "In 1921, the Pugh family ancestors gave Fortuna Oil Company (Fortuna) the right to construct a casing bead gas plant on the property. Fortuna already held a mineral lease on this tract. In 1922, the Pugh ancestors sold surface rights on the property to Fortuna. Oil and gas operations were conducted on the property by Fortuna. Magnolia Oil Company (Magnolia) later acquired the property from Fortuna. The casing head gas plant and several oil and gas wells were operated on the property. The tract was then conveyed back to the Pugh family in 1945 in settlement of a lawsuit with Magnolia... The surface rights were leased to Magnolia. The gas plant later ceased production, possibly in the 1950s." *Hopewell*, 770 So.2d at 875.

ages to the land. *See Gumbel v. New Orleans Terminal Co., supra* (purchaser had no right of action for damages arising from railroad tracks placed on land prior to purchase of land); *Taylor v. New Orleans Terminal Co.*, 126 La. 420, 52 So. 562 (1910) (purchaser had no right of action for damages from railroad company for taking land which occurred prior to the purchase of the land); *McCutchen v. Texas & P. Ry. Co.*, 118 La. 436, 43 So. 42 (1907) (purchaser had no right of action for damages from railroad company for erecting right of way on land which occurred prior to the purchase of the land); *Bradford v. Richard, et al.*, 46 La.Ann. 1530, 16 So. 487 (1894) (purchaser of land had no right of action for damages arising from alleged taking of timber by defendant prior to purchase of the land); *Dorvin Land Corp. v. Parish of Jefferson*, 469 So.2d 1011 (1985) (landowner did not have standing to sue parish for removal of trees and dumping of spoil where damages took place prior to owner acquiring title).

It is undisputed that plaintiff is seeking damages arising from operations which occurred prior to plaintiff's acquisition of the land. For the foregoing reasons, the court concludes that plaintiff does not have standing to bring tort claims against IMC. Accordingly, the motion for summary judgment based on lack of standing to bring tort claims is **GRANTED.**

### 3. Nonrecoverable damages

IMC asserts that plaintiff has no right to recover damages for mental anguish, punitive damages, or attorney's fees.

■ A business entity is incapable of experiencing loss of enjoyment, mental anguish, and inconvenience. *Whitehead v. American Coachworks, Inc.*, 837 So.2d 678, 682 (2002) *citing City of New Orleans v. Grand Lodge of Independent Order of Odd Fellows*, 241 So.2d 7, 10 (1970). Plaintiff does not address this issue in its brief. The motion to dismiss plaintiff's claims for mental anguish damages contained in Paragraphs 24, 28, and 33 of the Complaint is therefore **GRANTED.**

Plaintiff asserts a claim for punitive damages under La. Civil Code Article 2315.3. Article 2315.3 was enacted in 1984 and was repealed in 1996. IMC argues that plaintiff's claims for punitive damages for activities occurring outside the 1984 to 1996 time-frame should be dismissed. Plaintiff does not oppose the motion, but argues only that the claim for punitive damages during this period should not be dismissed Accordingly, the motion to dismiss plaintiff's claim for punitive damages outside of the period of 1984 to 1996 is **GRANTED.**

The Complaint included a claim for attorney's fees, however, on September 7, 2004, plaintiff's counsel advised that this claim was being withdrawn.[31] This letter effectively provides notice that the motion to dismiss plaintiff's attorney's fees claim is unopposed. Accordingly, the motion to dismiss is **GRANTED** as unopposed.

## MEMORANDUM OPINION— RULING ON MOTION

### (Rec.Doc. 108)

Before the court is plaintiff's Memorandum in Support of the Motion for Reconsideration and/or for New Trial seeking reconsideration of the undersigned's October 19, 2004 ruling dismissing plaintiff's claims based on lack of standing. On November 4, 2004, the Motion for Reconsideration was granted and additional briefing was ordered. Plaintiff filed a supplemental memorandum in support and defendant filed an opposition.[1]

---

**31.** Rec. Doc. 97.

**1.** Rec. Doc. 111 and 112.

## Issues Presented

Plaintiff seeks an order vacating the Court's judgment dismissing plaintiff's claims for lack of standing to bring contractual and tort claims arising from defendant's alleged contamination of property. Plaintiff alleges it has standing to bring the claims because actions for restoration of property once burdened by a mineral lease are real rights which attach to the property, and that to the extent that the Act of Cash Sale was deficient, it is being amended to include the transfer of property rights to plaintiff.

## Background [2]

On October 19, 2004, defendant's motions to dismiss and for summary judgment were granted and judgment was entered dismissing plaintiff's claims against defendant.[3] As it relates to plaintiff's lack of standing to bring contractual and tort claims, the Memorandum Opinion states:

Plaintiff seeks damages based on IMC's breach of the 1961 lease and for IMC's tortious conduct. IMC argues that since plaintiff was not a party to the contract and the previous owners' rights under the 1961 lease were not specifically assigned to plaintiff, plaintiff lacks standing to bring the breach of contract claims. Moreover, IMC maintains that since the tortious conduct occurred prior to plaintiff owning the property, it cannot assert tort claims for damages. Plaintiff maintains that it has standing because it is a third party beneficiary of the contract and because tort damages can be brought regardless of the timing of the damages.

\* \* \* \* \* \*

---

**2.** For a detailed review of the procedural and factual background, see Rec. Doc. 105.

**3.** Rec. Doc. 105.

**4.** Judgment was entered October 19, 2004 (Rec.Doc. 105). According to Fed. R. Civ.

There is no dispute that plaintiff has no direct privity of contract with IMC, nor does plaintiff allege that it obtained any assignment of rights in the the Act of Sale from the previous owners, other than warranty of title.

After an exhaustive review of the law regarding stipulations *pour autri* and standing to bring tort claims arising from damage to property, the Court found that plaintiff did not have standing to bring contractual or tort claims.

## Legal Analysis

The Federal Rules of Civil Procedure do not recognize a motion to reconsider *in haec verba*. *See Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir.1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n. 14 (5th Cir.1994). The Fifth Circuit has held that a motion to reconsider a dispositive pretrial motion may be classified under either Rule 59 or Rule 60, depending upon the time of filing. *Id.* If the motion is filed within ten days of the court's judgment, a motion for reconsideration is treated as a Rule 59(e) motion "to alter or amend" the judgment. *Id.* If filed more than ten days after the judgment, a motion for reconsideration falls under Rule 60(b) as a motion for "relief from judgment." Here, plaintiff filed the motion for reconsideration less than ten days after this Court entered its judgment.[4] Accordingly, the Court analyzes plaintiff's motion under Rule 59(e).

The district court has considerable discretion to grant or deny a motion under Rule 59(e). *Edward H. Bohlin Co.*,

Proc. Rule 6, the day of the judgment and weekends are not included in computing time delays that are less than ten days. Accordingly, the motion filed on November 2, 2004 was filed within ten days of judgment.

*Inc. v. Banning Co., Inc.,* 6 F.3d 350, 355 (5th Cir.1993); *Lavespere,* 910 F.2d at 174. The court must "strike the proper balance between the need for finality and the need to render a just decision on the basis of all the facts." *Bohlin,* 6 F.3d at 355. It is well established that a party may not use Rule 59(e) to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the court order. See *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir.1990); *Louis Dreyfuss Corp. v. McShares, Inc.,* 1990 WL 3916, at *1 (E.D.La. Jan. 17, 1990) ("Relitigation of previously decided issues is not favored, particularly when no newly discovered evidence or other compelling reason exists.").

### Standing to enforce restoration obligation

Plaintiff asserts that defendant had an obligation under the Mineral Code, La. R.S. 31:1 *et seq,* to restore the property, and that plaintiff has standing to enforce that obligation. In the original ruling, the court found that since plaintiff was not assigned the right to enforce the obligations of the mineral lease, plaintiff did not have standing to bring the claims. Plaintiff maintains that since mineral leases are classified as real rights, they attach to the land and there was no need for a particular assignment of rights to plaintiff in order for plaintiff to have standing to bring suit.

Plaintiff is correct that the Mineral Code imposes an obligation on a mineral lessee to restore the leased property. The Louisiana Supreme Court and the Third Circuit Court of Appeals of Louisiana have recognized the contractual duty of a mineral lessee to restore the surface upon completion of operations. *See Caskey v. Kelly*

*Oil Company,* 737 So.2d 1257 (La.1999) and *Trinidad Petroleum Corporation v. Pioneer Natural Gas Company,* 416 So.2d 290 (1982). In *Trinidad,* the court held that an implied obligation of a mineral lessee to restore the surface when operations are completed is read into every mineral lease.

This, however, is not dispositive of the issue before this court. Regardless of whether or not an obligation existed, plaintiff must have standing to bring the action to enforce the obligation. Plaintiff maintains that since a mineral lease is a real right, the obligations attach to the land, and therefore, the owner of the land has standing to bring action against the mineral lessee, despite the lack of privity of contract between plaintiff and defendant.[5]

The original ruling characterized plaintiff's action in the case at bar as a personal right, which did not attach to the property. Although, Louisiana R.S. 31:16 provides that a mineral lease, as a mineral right, is a real right, a review of the Mineral Code and the jurisprudence shows that it is not purely a real right that automatically attaches to the property, and therefore, the result of the original ruling was correct. In *Sketoe v. Exxon Co.,* 188 F.3d 596, 600–601 (5th Cir.1999), the court noted the dual nature of mineral leases, concluding that the mineral lease gives rise to a limited personal servitude, which is a real right:

> The Louisiana mineral lease includes features that are characteristic of both contracts and rights in property. *See id.* § 31:16 cmt. (noting that the mineral lease is "a hybrid institution"); *see generally* 1A W.L. SUMMERS, THE LAW OF OIL AND GAS § 167 (2d ed. 1954 & Supp.1999); Martin & Yeates, *supra,* at 823–26. For instance, we interpret

---

**5.** Real rights and obligations transfer from the seller to the buyer without any special provision. La.Civ.Code art. 1763. Personal rights, however, do not transfer in the absence of a special assignment of rights to the buyer. La.Civ.Code art. 1764.

the terms of the lease agreement as we would any other lease. *See* La.Rev.Stat. Ann. § 31:2; *Massie v. Inexco Oil Co.,* 798 F.2d 777, 779 (5th Cir.1986). Indeed, the lease itself is a "contract." La.Rev. Stat. Ann. § 31:114. As such, it does not create an unlimited mineral servitude, and Louisiana's liberative prescription for ten years nonuse therefore does not apply. *See Reagan v. Murphy,* 235 La. 529, 105 So.2d 210, 215 (La.1958). On the other hand, as an "incorporeal immovable" *601 a mineral lease carries "real rights" and is "subject to the laws of registry." *See* La.Rev.Stat. Ann. §§ 31:16,:18; *St. Charles Land Trust v. St. Amant,* 253 La. 243, 217 So.2d 385, 390 (La.1968) ("Under Louisiana law, the mineral leases and servitudes held by the trustees are immovable property."). Strictly speaking, the mineral lease creates a kind of servitude called a "limited personal servitude." *See* 3 a.N. Yiannopoulis, Louisiana Civil Law Treatise: Personal Servitudes § 223, at 450 (3d ed.1989). "Limited personal servitudes are real rights that confer on a person limited advantages of use or enjoyment over an immovable[, *i.e.,* realty,] belonging to another person." *Id.* at 448–49.

▬ Thus, it is in the nature of a limited personal servitude that the mineral lease is a real right. The limited personal servitude is explained in the Comments to La. C.C. Art. 639 as constituting "an intermediary category between personal and predial servitudes. Like usufruct and habitation, they are charges on things in favor of a person rather than an estate; like predial servitudes, they are necessarily charges on an immovable belonging to another person and are confined to certain advantages of use or enjoyment." Although a right of use, i.e., a personal servitude, is a real right, it is one granted in favor of a person rather than an estate, and therefore it does not pass with the property upon sale of the property. *Sustainable Forests, L.L.C. v. Harrison,* 846 So.2d 1283, 1284 (2003). A predial servitude, however, is created to benefit an estate, and therefore, is inseparable from the estate and passes with it upon sale. La. C.C. Art. 650.

In the case of a mineral lease, the Mineral Code designates the right as a real one in order to protect the mineral lessee from losing his rights if the land is sold during the existence of the lease. This conclusion is apparent in the reasoning behind La.R.S. 31:16, which are illustrated in the Comments stating:

> All things considered, the lease has the major characteristics of a real right: the mineral lessee may follow the land, regardless of transfers of ownership; the mineral lessee may assert his rights against the world just as the proprietor of any other real right; he may enjoy directly and draw from the land a part of its economic advantages by appropriating a wasting asset; he has certain rights of preference; and he holds a right that is in reality susceptible of a type of possession through exercise.

The fact that the real right created is the right held by the lessee, is specifically noted in the Comments to La.R.S. 31:154, "The mineral lease, though it creates a real right *in the hands of the lessee* is still an elaborate contractual relationship." Accordingly, the mineral lease gives real rights to the lessee, but the Mineral Code is void of any indication that it creates real rights in favor of the lessor. This is accounted for in the Comments to La.R.S. 31:16, which note:

> It is true that there are certain distinctions from the normal real right which give the mineral lease markings of kinship to personal rights. Not all obligations created by the lease are binding on a subsequent owner of the land.

However, these distinguishing marks are susceptible of recognition and are dealt with appropriately in the articles of this code governing mineral leases. The basic purpose of this article is to recognize that insofar as the mineral lease transfers both operating rights and rights to production it is a real right and not a mere personal contract.

Further, the jurisprudence does not indicate that a subsequent landowner has standing to sue a former mineral lessee based on the status of the mineral lease as a mineral right.[6] Moreover, the cases which do involve the issue presented herein, i.e., whether a subsequent landowner has standing to bring suit based on the expired mineral lease, require the subsequent landowner to some form of privity of contract, assignment of rights, or be the beneficiary of a stipulation *pour autri.* *Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp.,* 790 So.2d 93, 100–101 (2001) (subsequent landowner had standing to bring claims as a beneficiary of a stipulation *pour autri*); *Hargroder v. Columbia Gulf Transmission Co.,* 290 So.2d 874, 876 (La.1974) (stipulation *pour autri*). As stated in the original ruling, "There is no dispute that plaintiff has no direct privity of contract with IMC, nor does plaintiff allege that it obtained any assignment of rights in the Act of Sale from the previous owners, other than warranty of title."[7] Plaintiff now, after the Court's ruling, claims that the parties to the Act of Sale intended to assign rights to plaintiff, and therefore, the Act of Sale will be amended to so state. Plaintiff has not provided a copy of the Amended Act of Sale, nor is there any indication that such an amendment will be allowed by the state court.

Considering the foregoing, the Court's finding that plaintiff does not have standing to bring contractual or tort claims will not be altered. Accordingly,

**IT IS ORDERED** plaintiff's request to vacate the October 19, 2004 ruling in favor of defendant is **DENIED.**

---

6. The lone case cited by plaintiff is factually distinguishable in that in *Magnolia Coal Terminal v. Phillips Oil Co.,* 576 So.2d 475 (La. 1991) the landowner purchased the land while the mineral lease was still in existence.

Here, on the other hand, the lease had expired and was no longer in effect when plaintiff purchased the land.

7. Rec. Doc. 105 at p. 17.