STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2020 CA 0622

LEXINGTON LAND DEVELOPMENT, L.L.C.

VERSUS

CHEVRON PIPELINE COMPANY, CHEVRON U.S.A., INC., DIXON
MANAGEMENT CORPORATION, KENMORE OIL COMPANY, INC.,
THE STONE PETROLEUM CORPORATION, ZINN PETROLEUM
COMPANY, SHELL PIPELINE COMPANY, L.P., STONE ENERGY
CORPORATION, MICHAEL MADDEN, SCOTT ANDERSON & GREG
SOUTHWORTH

Judgment Rendered: ___MAY 2 5 2021___

Appealed from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket Number 561893

Honorable Timothy E. Kelley, Judge Presiding

\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| Victor L. Marcello | Counsel for Plaintiff/Appellant, |
| John H. Carmouche | Lexington Land Development, |
| Donald T. Carmouche | L.L.C. |
| William R. Coenen, III | |
| John S. Dupont, III | |
| Brian T. Carmouche | |
| Todd J. Wimberly | |
| Ross J. Donnes | |
| D. Adele Owen | |
| Caroline H. Martin | |
| Leah C. Poole | |
| Christopher D. Martin | |
| Michael L. Heaton | |
| Baton Rouge, LA | |

Thomas M. McNamara
Amy E. A. Lee
Patrick W. Gray
Jessica T. Gachassin
Lafayette, LA

S. Suzanne Mahoney
New Orleans, La

Nichole Martin Gray
Mandeville, LA

John Michael Parker
Edward D. Hughes
Baton Rouge, LA

Victor Gregoire
Charles S. McCowan, III
Linda S. Akchin
Kimberly K. Hymel
Richard D. McConnell, Jr.
Kristi D. Obafunwa
Baton Rouge, LA

Michael R. Phillips
Louis Grossman
Claudia Carrizales
New Orleans, LA

R. Benn Vincent, Jr.
James P. Dore
Matthew B. Smith
Baton Rouge, LA

Dylan T. Thriffiley
New Orleans, LA

Counsel for Defendant/Appellee,
Shell Pipeline Company, L.P.

Counsel for Defendant/Appellee,
Zinn Petroleum Co.

Counsel for Defendants/Appellees,
Chevron U.S.A., Inc. & Chevron
Pipeline Co.

Counsel for Defendant/Appellee,
Michael Madden

\*\*\*\*\*\*\*\*\*\*\*\*

BEFORE: WHIPPLE, C.J., WELCH, AND CHUTZ, JJ.

2

**WHIPPLE, C.J.**

This matter is before us on appeal by plaintiff, Lexington Land Development, L.L.C., from a judgment of the trial court dismissing its claims against Chevron U.S.A., Inc. with prejudice. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

This litigation involves claims by Lexington Land Development, L.L.C. ("Lexington") for damages caused by oil and gas operations to property known as the Sardine Point Field located in East Baton Rouge Parish between the Mississippi River and Louisiana Highway 30. In 1959, the owners of the property, referred to by the parties as "the Hoffman Heirs," granted a mineral lease of 343.254 acres to The California Company, predecessor-in-interest to Chevron U.S.A., Inc. ("Chevron"). Thereafter, Chevron and its assignees and sublessees conducted oil and gas exploration and production activities on the property. Shell Pipeline Company, L.P. ("Shell Pipeline") owns and operates a pipeline that traverses the property, which transports hydrocarbons.[1]

That same year, the Hoffman Heirs also granted Chevron a surface lease of five acres, contained within the original leased property, for drilling, which included an option to lease an additional five-acre tract for the purpose of storing oil, gas, and minerals. The surface lease expired in July of 1962. In 1963, Chevron released, relinquished, and surrendered its rights and title under the mineral lease, except for three production units established by order numbers 527-A and 527-B of the Commissioner of Conservation, effective September 1, 1961

---

[1] As noted by the Louisiana Supreme Court, these types of actions are often referred to as "legacy litigation" because they often arise from operations conducted many decades ago, leaving an unwanted "legacy" in the form of actual or alleged contamination. See Marin v. Exxon Mobil Corporation, 2009-2368, 2009-2371 (La. 10/19/10), 48 So. 3d 234, 238, n.1, citing Loulan Pitre, Jr., *"Legacy Litigation" and Act 312 of 2006*, 20 Tul. Envt. L.J. 347, 34 (Summer 2007).

3

(hereinafter "the retained acreage"), and certain surface use rights pertaining to the retained units (hereinafter "the retained surface rights").

On November 1, 1990, Chevron assigned its rights, title, and interest in the mineral lease to Stone Petroleum Corporation ("Stone Petroleum") and thereafter ceased all operations in 1991. Stone Petroleum subsequently assigned its rights and interest in the mineral lease to Robert L. Zinn d/b/a Zinn Petroleum Company on December 1, 1991.

On June 10, 2005, Lexington purchased the property,[2] which had been subdivided into three parallel tracts, from the Hoffman Heirs for $6,900,000.00[3] for the development of a residential subdivision on Tract 1. Tract 1 consists of 267.57 acres that lie east of Nicholson Drive (La. Hwy. 30), Tract 2 consists of 29.88 acres that lie west of Nicholson Drive and east of River Road (La. Hwy. 327), and Tract 3 consists of 46.59 acres that extend from River Road west across the levee and batture to the Mississippi River.

Pursuant to the act of sale, the Hoffman Heirs reserved the mineral rights subject to prior leases, servitudes, and agreements of record, and the right to allow directional drilling from adjacent lands to extract oil, gas, or other minerals from the property.

Prior to its purchase of the property, Lexington, through its owner, Gregory Dean Flores, retained Conestoga-Rovers & Associates ("CRA") to perform an evaluation of the environmental conditions of the three tracts, which was required by the bank as a condition of its loan. CRA's Phase I Environmental Site Assessment identified certain conditions of environmental concern on Tracts 1 and

---

[2]Integrity Homes, Inc. purchased the property with Lexington and, contemporaneous with the act of sale, executed an act of conveyance and capital contribution transferring its entire interest in the property to Lexington.

[3]The act of sale provided that $5,542,748.00 of the purchase price was allocated to Tract 1; $530,321.00 to Tract 2,; and $826,895.00 to Tract 3.

2. Lexington requested CRA to conduct a Phase II Site Investigation for further testing of the soil and groundwater to address the environmental concerns, which concluded that constituent concentrations in the groundwater samples above the Louisiana Department of Environmental Quality ("LDEQ") Risk Evaluation/Corrective Action Program ("RECAP") regulation screening standard were present at the site.[4] CRA thus recommended that a permanent monitor well be installed and that a RECAP evaluation of the site be performed to develop site-specific RECAP standards and/or remedial standards. Lexington performed the remediation measures as recommended for Tract 1, but did not perform the RECAP evaluation recommended for Tract 2. Lexington thereafter submitted the Phase I and II evaluations to the bank, and financing to purchase the property was approved.

In early 2007, Lexington was notified that a rupture in Shell's pipeline on the property had occurred. Thereafter, on December 7, 2007, Lexington filed suit against various defendants, including Chevron, its assignees and sub-lessees, and Shell Pipeline, asserting claims for damages sustained by oil and gas exploration and production activities, including the negligent operation of a hydrocarbon pipeline.

Chevron filed a motion for partial summary judgment, seeking dismissal of all of Lexington's claims for damages as to Tracts 1 and 3 on the basis that: (1) Lexington could not establish damages to these Tracts; and (2) Lexington's claims for damages to Tract 2, resulting from any alleged breach of any express provisions of any mineral or surface lease, and for alleged damages that were

---

[4]The LDEQ RECAP regulation establishes the LDEQ's minimum remediation standards for present and past uncontrolled constituent releases.

5

sustained before Lexington purchased the property on June 10, 2005, were barred based upon the subsequent purchaser rule.[5]

In support, Chevron contended that Lexington was neither a lessor nor an assignee of the lessor under the mineral and surface leases, such that there was no privity of contract between Lexington and Chevron necessary to establish a breach of contract, there was no *stipulation pour autrui* in the mineral or surface lease in favor of Lexington, and the leases contained no express obligation to restore the leased premises.[6] The trial court agreed with Chevron, and following a hearing, signed a judgment on November 16, 2009, granting Chevron's motion for partial summary judgment.[7]

Lexington subsequently obtained assignments of rights from the Hoffman Heirs, and on October 25, 2013, filed a fifth supplemental and amending petition for damages to the property extending from the Mississippi River to Nicholson Drive (La. Hwy. 30) (Tract 2),[8] asserting claims in its own right and those assigned

---

[5]The subsequent purchaser rule is a jurisprudential rule which provides that an owner of property has no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase, in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted. Eagle Pipe & Supply, Inc. v. Amerada Hess Corporation, 2010-2267, 2010-2272, 2010-2275, 2010-2279, 2010-2289 (La. 10/25/11), 79 So. 3d 246, 256-257.

[6]In its opposition, Lexington conceded that it did not contest Chevron's motion for dismissal of all of its claims for damages to Tracts 1 and 3.

[7]Lexington appealed the trial court's grant of summary judgment as to its claims against Chevron for pre-acquisition damages as to Tract 2. This court, however, dismissed the appeal after performing an analysis under R.J. Messinger, Inc. v. Rosenblum, 2004-1664 (La. 3/2/05), 894 So. 2d 1113, 1122, and determining that the close relationship between the adjudicated and unadjudicated claims (pre-acquisition and post-acquisition) provided reason for delay, making an immediate appeal inappropriate. See Lexington Land Development, L.L.C. v. Chevron Pipe Line Company, 2010-0144 (La. App. 1st Cir. 12/16/10) (unpublished) 2010 WL 5135246, *4.

[8]Although both Tracts 2 and 3 are located within the area between Nicholson Drive (La. Hwy. 30) and the Mississippi River, Lexington's claims as to Tract 3 were dismissed. Thus, the claims set forth in the fifth supplemental and amending petition are only in reference to alleged damages to Tract 2.

to it by the Hoffman Heirs, both as mineral servitude owners and former surface owners, in tort, property, contract, and mineral law.[9]

Chevron thereafter filed a peremptory exception of prescription, seeking dismissal of Lexington's remaining claims against Chevron, contending that Lexington's claims against Chevron are facially prescribed, where it is evident from the petition that Chevron's operations ceased in 1991. Chevron contended that even if not prescribed on the face of the petition, all of Lexington's claims against it were subject to liberative prescription of one year, and that Lexington had actual knowledge of the alleged damage no later than December 7, 2007, when it filed its original petition for damages. Chevron further averred that Lexington could not have been assigned any claims under the 1959 mineral or the surface lease because those leases expired prior to the assignments, and that even assuming Lexington could have been assigned any rights under those leases, claims for breach of an implied lease are subject to a one-year prescriptive period, unless a specific provision of the lease is breached. Chevron contended that Lexington had actual knowledge of the alleged damage nearly six years before the filing of its fifth supplemental petition on October 25, 2013, and that it could not avoid the accrual of prescription by obtaining assignments from the former property owners. Shell Pipeline filed a "Motion to Join and Adopt Chevron's Peremptory Exception of Prescription," seeking dismissal of Lexington's claims for pre-acquisition damages against Shell Pipeline.

In addition to the issue of prescription raised in its exception, Chevron also filed a motion for partial summary judgment as to Lexington's claims for post-acquisition damages and breach of lease. Therein, Chevron contended that it was

---

[9]In response to various dilatory and peremptory exceptions by defendants, Lexington's claims for punitive damages, mental anguish and distress, strict liability under pre-1996 amendment law, damages pursuant to LSA-C.C. art. 2322, absolute liability for ultrahazardous activities, intentional torts other than trespass, and civil fruits were dismissed pursuant to a May 12, 2016 judgment.

7

impossible for the Hoffman Heirs to transfer rights to Lexington under the surface lease, which expired in 1962, or the mineral lease, which expired no later than 2011, where the leases had expired prior to the Hoffman Heirs's assignment of rights in 2012 and 2013. Thus, Chevron contended Lexington had no claim against Chevron for breach of any lease obligations.

Lexington filed a "Motion for Reconsideration" and order to show cause why the trial court's November 16, 2009 judgment granting Chevron's motion for partial summary judgment and dismissing Lexington's claims for pre-acquisition damages, should not be reversed.

These matters were each heard separately before the trial court on July 22 and 23, 2019. At the hearing, the trial court granted Shell's motion to join Chevron's peremptory exception of prescription and took the remaining matters under advisement.

On October 15, 2019, the trial court rendered a judgment, accompanied by written reasons for judgment: denying Chevron's motion for partial summary judgment;[10] denying Lexington's motion for reconsideration; granting Shell's motion to join and adopt Chevron's peremptory exception of prescription regarding pre-acquisition damages; and maintaining Chevron's peremptory

---

[10]In denying Chevron's motion for partial summary judgment seeking dismissal of Lexington's assigned claims for post-acquisition damages, the trial court determined that the personal nature of the right to sue for post-acquisition damages and breach of lease was transferred in the 1959 lease agreement, stating as follows:

> [T]he express language of the 1959 Mineral Lease Agreement endeavored to expansively define "Lessor" and "Lessee" such that "all parties who execute [the] lease ... as well as the respective heirs, successors, and assigne[es] of all such parties ... shall be bound by the provisions of these lease." (Emphasis added). Because [Lexington's] assignors owned the rights to enforce the end-of-lease restorative obligations under La. C.C. art. 2683, [Lexington] now owns the right to sue for enforcement of those obligations.

Nonetheless, the trial court ultimately determined that Lexington's assigned claims, whereby Lexington sought to enforce the end-of-lease restorative obligations pursuant to LSA-C.C. art. 2683, had prescribed, concluding that the applicable prescriptive period for breach of these obligations is one year and that Lexington possessed sufficient knowledge to trigger the running of prescription in 2005.

exception of prescription. On November 12, 2019, the trial court signed a "Final Judgment," dismissing all claims by Lexington against Chevron with prejudice.[11]

Following the denial of its motion for new trial, Lexington filed the instant appeal, challenging the trial court's grant of Chevron's peremptory exception of prescription and denial of its motion for reconsideration.

## DISCUSSION

### Appellate Jurisdiction

As an appellate court, we are obligated to recognize our lack of jurisdiction if such exists. Quality Environmental Processes, Inc. v. Energy Development Corporation, 2016-0171, 2016-0172 (La. App. 1st Cir. 4/12/17), 218 So. 3d 1045, 1053. This court's appellate jurisdiction extends only to final judgments of the trial court. See LSA-C.C.P. art. 2083(A); Marrero v. I. Manheim Auctions, Inc., 2019-0365 (La. App. 1st Cir. 11/19/19), 291 So. 3d 236, 238. A final judgment is one that determines the merits in whole or in part. In contrast, an interlocutory judgment does not determine the merits, but only preliminary matters in the course of an action. LSA-C.C.P. art. 1841; Advanced Leveling & Concrete Solutions v. Lathan Company, Inc., 2017-1250 (La. App. 1st Cir. 12/20/18), 268 So. 3d 1044, 1046 (en banc).

A valid judgment must be precise, definite, and certain. DeVance v. Tucker, 2018-1440 (La. App. 1st Cir. 5/31/19), 278 So. 3d 380, 382. Moreover, a final appealable judgment must contain decretal language and must name the party in favor of whom the ruling is ordered, the party against whom the ruling is ordered, and the relief that is granted or denied. Marrero v. I. Manheim Auctions, Inc., 291 So. 3d at 238. These determinations should be evident from the language of the

---

[11]The trial court also signed a separate judgment, dismissing, with prejudice, Lexington's claims against Shell Pipeline for alleged property damages pre-dating June 10, 2005. This judgment is not before us on appeal.

judgment without reference to other documents in the record. See <u>Advanced</u> <u>Leveling & Concrete Solutions v. Lathan Company, Inc.</u>, 268 So. 3d at 1046.

In this matter, Lexington appealed both the October 15, 2019 "Judgment" and the November 12, 2019 "Final Judgment" of the trial court. Chevron contends that the trial court's denial of Lexington's motion for reconsideration is an interlocutory order, which is not reviewable by this court on appeal.

The October 15, 2019 judgment: (1) denies Lexington's motion for reconsideration; (2) grants Chevron's peremptory exception of prescription; (3) denies Chevron's motion for summary judgment; and (4) grants Shell's motion to join and adopt Chevron's peremptory exception pf prescription regarding pre-acquisition damages. Although the judgment grants Chevron's exception of prescription, it does not specify the relief granted, nor does it dismiss any party or claims (pre-acquisition or otherwise). Thus, to the extent that the October 15, 2019 judgment grants Chevron's peremptory exception of prescription, but fails to dismiss a party or any claims, or to otherwise specify the relief entailed, the judgment is defective in that it lacks decretal language and, as such, is not considered a final judgment over which this court's appellate jurisdiction extends. See <u>Gaten v. Tangipahoa Parish School System</u>, 2011-1133 (La. App. 1st Cir. 3/23/12), 91 So. 3d 1073, 1074; <u>Johnson v. Mount Pilgrim Baptist Church</u>, 2005-0337 (La. App. 1st Cir. 3/24/06), 934 So. 2d 66, 67; <u>Rivault v. American Homeland, LLC</u>, 2019-1468 (La. App. 1st Cir. 9/21/20), ___ So. 3d ___, ___, 2020 WL 5627995, *3, citing <u>Advanced Leveling & Concrete Solutions v. The Lathan Company, Inc.</u>, 268 So. 3d at 1046-1047.

The trial court's November 12, 2019 judgment dismisses all of Lexington's claims against Chevron with prejudice and, thus, constitutes a final, appealable judgment. As such, Lexington is entitled to seek review of the trial court's

10

dismissal of its claims against Chevron in its appeal of the November 12, 2019 judgment.

As to Lexington's appeal of the trial court's denial of its motion for reconsideration, however, the Louisiana Code of Civil Procedure does not provide for a motion for reconsideration with respect to any judgment; instead, such a motion is generally treated as a motion for new trial. Lewis v. Louisiana Department of Public Safety and Corrections, 2019-1693 (La. App. 1st Cir. 8/5/20), 312 So. 3d 592, 594, writ denied, 2021-00158 (La. 3/9/21), 312 So. 3d 583.

In denying the motion for reconsideration, the trial court likened Lexington's motion for reconsideration to a motion for new trial and concluded that a motion for new trial is a procedural device that is only available to final judgments. The trial court thus determined that where the November 16, 2009 judgment was not a final judgment, the motion for new trial of that judgment was procedurally improper.[12]

Pretermitting whether the trial court was correct in this view, we note that Lexington's motion for reconsideration, in actuality, seeks review of the trial court's November 16, 2009 judgment, which granted partial summary judgment in favor of Chevron as to Lexington's claims for pre-acquisition damages.[13] However, the November 16, 2009 judgment granted a partial summary judgment as to less than all of the claims and, upon examination, this court previously determined that the judgment was improperly certified as final for purposes of an immediate appeal. See Lexington Land Development, L.L.C. v. Chevron Pipe

---

[12]The trial court further noted that, in any event, it nonetheless "stands by its reasons" for dismissing Lexington's claims for pre-acquisition damages in its November 16, 2009 judgment.

[13]It has long been recognized that a court will look to the import of a pleading and not be bound by the title. In re S.H., 2016-1482, 2016-1483 (La. App. 1st Cir. 2/17/17) (unpublished) 2017 WL 658255, *1. Every pleading is to be construed so as to do substantial justice. LSA-C.C.P. art. 865. The caption of the pleading does not control. Atchley v. Atchley, 2001-67 (La. App. 5th Cir. 5/30/01), 788 So. 2d 690, 693, writ denied, 2001-1915 (La. 2/8/02), 808 So. 2d 349. Rather, the court is obligated to determine the substance of the pleading. Smith v. Cajun Insulation, Inc., 392 So. 2d 398, 402, n.2 (La. 1980).

11

Line Company, 2010-0144 at pp. 2-4, 2010 WL 5135246 at *2-4; LSA-C.C.P. art. 1915(B). Thus, where the judgment was improperly certified as a final judgment, it remains interlocutory.

Nonetheless, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to review of the final judgment appealed. See Russell v. Cantrelle, 2019-0815, 2018-1762 (La. App. 1st Cir. 5/11/20) 303 So. 3d 1081, 1085, n.5. Accordingly, we find that in view of Lexington's appeal of the November 12, 2019 judgment dismissing all of its claims against Chevron with prejudice, Lexington is entitled to seek review of this interlocutory ruling.

**Peremptory Exception of Prescription**

Lexington's first four assignments of error challenge the trial court's grant of Chevron's peremptory exception of prescription. Lexington contends on appeal that the trial court erred in: (1) dismissing Lexington's own tort, contract, property, and mineral law claims against Chevron; (2) dismissing the claims assigned to Lexington by the Hoffman Heirs; (3) finding that Lexington's claims and the claims assigned to Lexington by the Hoffman Heirs were prescribed; and (4) finding that claims based on a violation of the implied obligation of a mineral lease prescribe in one year.

Generally, the exceptor bears the burden of proof at the trial of the peremptory exception. Carter v. Haygood, 2004-0646 (La. 1/19/05), 892 So. 2d 1261, 1267. However, if prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. Campo v. Correa, 2001-2707 (La. 6/21/02), 828 So. 2d 502, 508.

If evidence is introduced at the hearing on the peremptory exception of prescription, the trial court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. London Towne Condominium Homeowner's

12

Association v. London Towne Co., 2006-401 (La. 10/17/06), 939 So. 2d 1227, 1231; Stobart v. State, Through DOTD, 617 So. 2d 880, 882 (La. 1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart v. State, Through DOTD, 617 So. 2d at 882-883. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Calloway v. Lobrano, 2016-1170 (La. App. 1st Cir. 4/12/17), 218 So. 3d 644, 650. However, where the issue of prescription turns upon the proper application and interpretation of statutory law, the exception presents a question of law for appellate review. See McKenzie v. Imperial Fire and Casualty Insurance Co., 2012-1648 (La. App. 1st Cir. 7/30/13), 122 So. 3d 42, 46, writ denied, 2013-2066 (La. 12/6/13), 129 So. 3d 534.

On review, an appellate court should not reweigh the evidence or substitute its own factual findings. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La. 4/3/02), 816 So. 2d 270, 279. Thus, under the principles which govern appellate review, if the trial court's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rando v. Anco Insulations, Inc., 2008-1163, 2008-1169 (La. 5/22/09), 16 So. 3d 1065, 1082; CamSoft Data Systems, Inc. v. Southern Electronics Supply, Inc., 2019-0730, 2019-0497 (La. App. 1st Cir. 7/2/19) (unpublished) 2019 WL 2865138, *7, writs denied, 2019-01232, 2019-01436 (La. 11/19/19), 282 So. 3d 1069, 1070.

Pursuant to LSA-C.C. art. 3493, the prescriptive period applicable to claims involving allegations of tortious conduct causing damage to immovable property is a one-year liberative prescription period. This one-year period "commences to run

13

from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." LSA-C.C. art. 3493. Thus, the commencement of prescription under this article is triggered by actual or constructive knowledge of damage.

Constructive knowledge has been defined by our courts as whatever notice is enough to excite attention and put the injured party on guard or call for inquiry. Hogg v. Chevron USA, Inc., 2009-2632, 2009-2635 (La. 7/6/10), 45 So. 3d 991, 997, citing Campo v. Correa, 828 So. 2d at 510-511. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry might lead, and such information or knowledge as ought to reasonably put the injured party on inquiry is sufficient to start the running of prescription. Hogg v. Chevron USA, Inc., 45 So. 3d at 997, citing Campo v. Correa, 828 So. 2d at 510-511. In assessing whether an injured party possessed constructive knowledge sufficient to commence the running of prescription, this court's ultimate consideration is the reasonableness of the plaintiff's action or inaction in light of the surrounding circumstances, including his education, intelligence, and the nature of the defendant's conduct. Hogg v. Chevron USA, Inc., 45 So. 3d at 997-998; Marin v. Exxon Mobil Corporation, 2009-2368, 2009-2371 (La. 10/19/10), 48 So. 3d 234, 246. A plaintiff is deemed to know what he can learn through the exercise of reasonable diligence and cannot rely on ignorance attributable to his own willfulness or neglect. Moore v. Chevron USA, 2016-0805 (La. App. 1st Cir. 5/25/17), 222 So. 3d 51, 54, writ denied, 2017-1085 (La. 10/16/17), 228 So. 3d 1221.

As to property damage claims, knowledge sufficient to start the running of prescription is the acquisition of sufficient information, which, if pursued, will lead to the true condition of things. Marin v. Exxon Mobil Corporation, 48 So. 3d at 246, citing Young v. International Paper Co., 179 La. 803, 155 So. 231 (La. 1934).

14

This date has been found to be the date the damage becomes apparent. Marin v. Exxon Mobil Corporation, 48 So. 3d at 246.

However, the doctrine of *contra non valentem* provides that prescription does not run against one who is ignorant of the *facts* upon which his cause of action is based and applies an exception to the statutory prescriptive period where *in fact and for good cause* a plaintiff is *unable* to exercise his cause of action when it accrues. Eastin v. Entergy Corporation, 2003-1030 (La. 2/6/04), 865 So. 2d 49, 55. In cases involving property damage, the concept of *contra non valentem,* otherwise known as the "discovery rule," is encompassed in the prescriptive period proscribed by LSA-C.C. art. 3493, as both essentially suspend prescription until the plaintiff knew, or reasonably should have known of the damage. Marin v. Exxon Mobil Corporation, 48 So. 3d at 245. While the *contra non valentem* "discovery rule" is only to be applied in extreme circumstances, and prescriptive statutes are to be interpreted broadly in favor of maintaining a party's claim, for the purposes of our review, the substantive analysis is the same under both LSA-C.C. art. 3493 and the discovery rule of *contra non valentem.* Marin v. Exxon Mobil Corporation, 48 So. 3d at 245.

At the commencement of the hearing on Chevron's peremptory exception of prescription, the parties stipulated that: (1) the 1959 lease expired as to retained surface rights in 2005, and the retained acreage rights expired in 2011 (as per the affidavit of Charlie Beckett, Jr.);[14] (2) the surface lease expired in 1962;[15] and (3) Chevron's operations ceased in 1991. Thereafter, the trial court found that

---

[14]Charlie Beckett, Jr., a professional landman, was retained in this matter to perform the task of determining whether the 1959 oil, gas, and mineral lease at issue herein covering the lands owned by Lexington is still in existence; and if not, when it would have lapsed by its own terms. He was also asked to examine the public records of the Commissioner of Conservation concerning any oil and gas activities conducted on the property and any oil and gas activities conducted on properties unitized with all or a portion of the property.

[15]Lexington conceded at the hearing that it was abandoning its surface lease claims under the terms of the 1959 lease because they were expired.

Chevron had presented sufficient evidence to establish a *prima facie* showing that Lexington had constructive knowledge with reference to Lexington's non-contract or tort claims. Thus, the burden shifted to Lexington to show that its claims were not prescribed.

In support, Lexington introduced the Phase II Site Investigation Figure II Plat, an aerial topography photograph, the affidavit of Charlie Beckett, Jr., and the assignments from the Hoffman Heirs, owners of the mineral servitude. Lexington also called Gregory Miller, Charles R. Norman, and Mr. Flores to testify.

Thereafter, the trial court issued the following written reasons in support of its finding that Lexington's claims against Chevron were prescribed:

> Although Plaintiff might possess the right to enforce the above-referenced end-of-lease obligations, Plaintiff's claims against Chevron ultimately cannot survive prescription. Plaintiff alleges that Chevron breached its restorative obligations under the 1959 Lease, and that the ten-year prescriptive period set forth in La. C.C. art. 3499 should therefore apply. No such specific contractual obligations, however, appear in the Mineral Lease. Instead, the lease only provides that "Lessee shall be obligated to drill only such wells as a reasonably prudent operator would drill under the same or similar circumstances." What Plaintiff has actually alleged is a breach of Chevron's *statutory* obligations as a mineral lessee under La. C.C. 2683, for which the applicable prescriptive period is one-year. Under La. C.C. 3493, this one-year prescriptive period "commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." Knowledge sufficient to trigger the running of prescription has been defined as "whatever notice is enough to excite attention and put the injured party on guard or call for inquiry." *Hogg v. Chevron U.S.A., Inc.*, 45 So. 3d 991 (La. 7/6/10). A [P]laintiff need not have knowledge of the nature and extent of the damage; "prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage ... even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234 (La. 10/19/10).
>
> This Court finds that Plaintiff possessed sufficient knowledge to trigger the running of prescription in 2005. The evidence establishes that Plaintiff expressly acknowledged several explicit disclaimers in the Act of Sale regarding potential "environmental issues" and conditions related to the oilfield operations, including the disposal of "pollutants or contaminants" on the subject property. Significantly, Plaintiff did not dispute at the hearing in this matter that

16

the sale price took into consideration the environmental condition of the property. The purchase price and disclaimers coupled with the revelations of the Phase I and Phase II environmental assessments -- including the Phase I aerial photographs of saltwater scarring and stressed vegetation -- should have, at the very least, prompted Plaintiff to further investigate the environmental integrity of the property that it was preparing to purchase. Consequently, Plaintiff cannot rely upon the doctrine of *contra non valentum* to defeat prescription where the facts forming the basis of Plaintiff's claims against Chevron were discoverable in 2005 had Plaintiff only exercised reasonable diligence. *See Marin*, 48 So. 3d at 252.

For these reasons, Chevron's Exception of Prescription is hereby GRANTED.

Thus, the claims dismissed by the trial court as prescribed were: (1) Lexington's tort, contract, property, and mineral law claims; (2) the non-contract claims assigned to Lexington by the Hoffman Heirs; and (3) the contract claims assigned by the Hoffman Heirs. We will first address the assignments of error and evidence presented as they relate to Lexington's claims.

### Lexington's Claims

In support of its peremptory exception, Chevron introduced the June 10, 2005 Act of Cash Sale, the 1959 Oil, Gas, and Mineral Lease, the Louisiana Department of Natural Resources ("LDNR") files for wells serial number 80043 and serial number 82762, the Phase I Environmental Site Assessment by CRA, the Phase II Site Investigation by CRA, and the November 1, 1990 Assignment, Bill of Sale, and Conveyance to Stone Petroleum. Chevron contends that this evidence clearly demonstrates that Lexington had sufficient information to trigger the running of prescription when it purchased the property in 2005. Lexington counters that the evidence relied upon by Chevron regarding the testing obtained by Lexington to secure the bank loan was not and should not be considered as tantamount to knowledge of all of the circumstances and conditions of the property.

17

The record reflects that as a condition of the loan allowing Lexington to purchase the property at issue, Lexington was required by the bank to obtain an evaluation of the environmental conditions of the property. Thus, Lexington retained CRA to perform an environmental site assessment, and on February 10, 2005, CRA conducted a site inspection. In March of 2005, CRA presented its Phase I Environmental Site Assessment findings in a written report to Lexington, which described the three tracts as follows:

> Tract 1 is 267 acres of former agricultural land east of Nicholson Drive. There are several structures on the north side of the tract and eight plugged and abandoned petroleum wells scattered throughout the tract. Formerly there was a tank battery on Tract 1. **Tract 2 is 30 acres west of Nicholson Drive and east of the River Road (LA 327). Much of this tract supports petroleum exploration and production facilities and equipment, including an active tank battery and a saltwater disposal well.** Tract 3 is 47 acres extending from the River Road west across the Corps of Engineers levee and the batture to the Mississippi River.

(Emphasis added.)

In preparing the Phase I assessment, CRA utilized aerial photographs from 1968, 1970, 1978, 1989, 1995, and 2002 obtained from the U.S. Department of Agriculture, the U.S. Geological Survey, and Gulf Coast Aerial Mapping Company, Inc. to assist in identifying areas of potential environmental concern. CRA was able to identify four tanks and a pit associated with a tank battery on Tract 1; two wells and one pit in the center of Tract 2; two well pads, three pits, several tanks on the central and southern parts of Tract 2; and two possible residences on the northern part of Tract 2. CRA further identified eleven discarded above ground storage tanks where several areas of stained soil and distressed vegetation were present. In addition, CRA identified historically recognized environmental conditions, namely a compliance order issued in 1991 by the LDNR requiring the closure of two pits on Tract 2 by Stone Petroleum Corporation. The LDNR compliance order was included as an exhibit in CRA's Phase I

18

environmental site assessment and indicated that an inspection conducted on June 7, 1991 found the "pits to be full and to have overflowed in the past" to the adjacent and surrounding area. The order provided that the pits were not in compliance with Statewide Order 29-B,[16] and the LDNR gave Stone Petroleum ten days to remove all contamination caused by the oilfield waste overflow and to lower the fluid level in the pits immediately. Thereafter, the pits were to be permanently closed.

At the conclusion of its Phase I environmental site assessment, CRA noted environmental conditions on Tracts 1 and 2, as follows:

**Tract 1:**
- stained soil near the carport of one of the trailers;
- soil near a pesticide and herbicide mixing area;
- stained soil around a large storage shed;
- soil beneath several ASTs;
- former burn pits;
- distressed and sparse vegetation at the former tank battery; and
- potential underground flowlines.

**Tracts 1 and 2:**
- soil and former pits near each former producing oil and gas, and saltwater disposal well; and
- underground flowlines from Tract 1 to Tract 2.

**Tract 2:**
- soil and former pits around the active saltwater disposal well and the former producing wells; and
- soil near the tank battery, former compressor station, and work shed.

To address the environmental concerns recognized in Phase I, Mr. Flores testified that CRA recommended that it be allowed to conduct a Phase II site investigation, which included testing and sampling the soil and groundwater to determine if hydrocarbon, herbicide, pesticide and naturally occurring radioactive material impact was present at the site. As part of its Phase II site investigation, on March 24 and 28, 2005, CRA installed ten soil borings (SB) and collected samples,

---

[16]Statewide Order 29-B (hereinafter referred to as "29-B") governs oil field operations and provides the consensus standards for acceptable and unacceptable levels for residual staining, etc.

19

installed temporary monitor wells, and collected groundwater samples from the temporary monitor wells.

In May of 2005, CRA presented Lexington with a written report of its Phase II Site Investigation containing the results of its testing. Therein, CRA concluded that constituent concentrations above the LDEQ RECAP regulation were detected at three locations at the site. The report disclosed that "[t]he compounds detected indicate impact from hydrocarbons, and likely are either constituents, breakdown products, or combustion products of weathered crude oil or refined hydrocarbons." CRA further advised that "RECAP management options available for further evaluation of impact require classifying groundwater at the Site to determine if it could be used as a drinking-water source from a well, or if human contact is likely from surface water." CRA thus recommended that Lexington install a four-inch-diameter permanent monitor near SB-1, SB-2, and SB-6 on Tract 1 and that a RECAP site evaluation be performed to develop site-specific RECAP standards and/or remedial standards for Tracts 1 and 2. Lexington performed the remediation measures recommended for Tract 1, but did not perform the RECAP evaluation for Tract 2, the tract at issue herein. After submission of the evaluation and recommendations, the bank approved the loan for purchase and development of the property.

Lexington then purchased the property, executing an act of cash sale on June 10, 2005. The act of sale transferred right, title, and interest in and to the property "without any warranty of recourse whatsoever," "as is, where is, with all faults, and without any warranties (other than warranty of title), express or implied, including but not limited to warranties of condition, fitness for a particular purpose or habitability." Lexington further acknowledged in the act of sale that the Hoffman heirs made no representation, warranty, or guaranty as to (a) "the condition or state of repair of the Property, including without limitation, any

20

condition arising in connection with the generation, use, transportation, storage, release or disposal of hazardous substances," which includes "all pollutants or contaminants, whether harmful or not, petroleum and natural gas and their components and distillates," and (b) the quality, nature, adequacy and physical condition of the property including "environmental issues." Lexington further acknowledged that "this waiver and disclaimer of express and implied warranties of fitness and the condition of the Property has been taken into consideration and is reflected in the terms of the Purchase Price." However, Lexington argues that this language was common, boiler-plate language and that, as such, it does not establish knowledge by Lexington of the true condition of the property.

Chevron contends that when Lexington purchased the property, Lexington undisputedly was aware that oil and gas operations had been conducted on the property for decades. Chevron further argues that the LDNR files for well serial number 80043 and well serial number 82762 introduced herein are public record and clearly establish the existence of numerous compliance orders and other public records from which Lexington could have easily acquired knowledge of the alleged damage, particularly where Lexington was made aware of the 1991 LDNR compliance order advising of the 29-B violation prior to its purchase of the property.

Chevron concludes that the Phase I and II findings by CRA, which included the LDNR compliance order, coupled with the environmental warranties and disclaimers in the act of sale, disclosed more than enough information to excite attention and put Lexington on guard to call for further inquiry and to commence the running of prescription, particularly where, given the results of its

21

investigation, CRA recommended that Lexington perform a RECAP evaluation on Tract 2, but Lexington ultimately chose not to do so.[17]

Lexington counters that Chevron's arguments and characterization of the evidence do not establish knowledge on its part. In support, Lexington relies on the testimony of Mr. Miller, the owner and president of Icon Environmental Services, who was accepted as an expert in the fields of geology, hydrogeology, site assessment, implementation of RECAP and remediation. Lexington hired Mr. Miller to provide oversight of Shell Pipeline's hydrocarbon remediation from the pipeline rupture in early 2007. Based on Mr. Miller's observations, within one month, he recommended to Mr. Flores that they evaluate for salt contamination and perform a terrain conductivity survey to detect the presence of conductive material in the subsurface. Mr. Miller further testified that after his review of CRA's Phase II Site Investigation in 2005, it did not appear to him that there were any "substantial issues" on Tract 2. Mr. Miller conceded that the aerial photographs in CRA's reports showed scarring around the production pit, but opined that CRA failed to properly test for oilfield constituents in the actual location of the pit. Thus, Mr. Miller concluded that based on CRA's Phase II Site Investigation report, he would not have recommended that Lexington take any further action.

As further support, Lexington also cites the testimony of Mr. Norman, who was accepted as an expert in petroleum engineering, wherein he stated that he agreed with the findings of Mr. Miller and, further, that based on CRA's report, he would not have objected to going through with the purchase of the property. However, Mr. Norman conceded on cross examination that he was aware of the LDNR compliance letter indicating that a pit had overflowed on the property,

---

[17]Chevron also points to the groundwater sample table in CRA's Phase II Site Investigation report, which it contends shows a concentration of benzene at more than three times the acceptable level near SB-10.

which was a violation of 29-B that could adversely impact the property, and that a regulatory exceedance found in groundwater would not be acceptable.

Mr. Flores testified that he was aware when he bought the property that oil and gas operations were continuing on the property. He testified that Hibernia Bank required an evaluation of the environmental conditions of the property as a requirement of the loan, and that he hired CRA to perform this evaluation. Mr. Flores testified that he received a copy of CRA's Phase I Environmental Site Assessment, which contained the 1991 LDNR compliance order advising of a 29-B violation resulting from a pit overflowing on the property, and that CRA recommended that a Phase II Site Investigation be performed in 2005. Although the Phase II investigation recommended preparation of a RECAP evaluation on Tract 2, he did not conduct any further testing on Tract 2 at that time. Mr. Flores testified that he hired Mr. Miller to oversee remediation of Shell's pipeline rupture in early 2007, and that through Mr. Miller's investigation, it was determined that there was further damage caused by oil and gas operations. Mr. Flores testified that before then, he was not aware that his property was contaminated and that he first learned that he had to remediate the property in 2007, based on Mr. Miller's reports.

As noted above, Lexington contends that the language in the act of sale is merely boiler plate "as is" language and that none of the deficiencies listed in CRA's Phase I and II reports were sufficient to put Lexington on notice of the extensive hidden, subsurface contamination on the property at issue herein. Moreover, with regard to Lexington's decision not to follow CRA's recommendation to perform a RECAP evaluation on Tract 2, Lexington maintains that its decision not to take this action was reasonable and intelligent, and was based on the CRA report.

23

As recognized in the jurisprudence, knowledge sufficient to start the running of prescription on a property damage claim is the acquisition of sufficient information, which, if pursued, will lead to the true condition of things, and constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard or call for inquiry. Marin v. Exxon Mobil Corporation, 48 So. 3d at 246; Hogg v. Chevron USA, Inc., 45 So. 3d at 997; Moore v. Chevron USA, 222 So. 3d at 54. A plaintiff is deemed to know what he can learn through the exercise of reasonable diligence and cannot rely on ignorance deemed attributable to his own willfulness or neglect. Moore v. Chevron USA, 222 So. 3d at 54.

In Marin v. Exxon Mobil Corporation, 48 So. 3d at 249-250, the Louisiana Supreme Court found that knowledge of damage that was apparent, which in that case was dying sugarcane, was sufficient information to excite attention and put plaintiffs on guard and call for inquiry, even though the damage they discovered later was more extensive, as the sugarcane damage was an outward sign of "actual and appreciable damage." The Supreme Court emphasized therein that the allegations of the plaintiffs' petition were based on the same facts that they could have discovered had they investigated earlier and that no additional damage had become apparent or occurred so as to end the suspension of prescription under the discovery rule. Despite assurances that remediation had occurred (and the plaintiffs' reliance on same), the Supreme Court reversed this court, determining that, under the applicable law, knowledge of the fact that a healthy sugarcane crop would not grow, based on plaintiffs' opportunity to observe same, constituted sufficient information, which, if pursued, would lead to the true condition of things.

Applying Marin v. Exxon Mobile Corporation to the instant case, as we must, we are constrained to conclude that even if we were to find that the

24

information available to Lexington in the public conveyance records regarding the condition of the property was insufficient to put Lexington on notice, CRA's investigation, as well as the photographs provided to Lexington, showed evidence of saltwater contamination and scarring near the production pit. Moreover, the majority of the facts that form the basis of the claims asserted in Lexington's petition appear to be the same facts revealed by CRA's Phase I and II reports before Lexington purchased the property. See Hogg v. Chevron USA, Inc., 45 So. 3d at 1001.

Thus, on the record before us, and considering the Supreme Court's ruling in Marin v. Exxon Mobile Corporation, the trial court's determination that the explicit disclaimers regarding potential "environmental issues" and conditions related to the oilfield operations, including the disposal of "pollutants or contaminants" on the property in the act of sale, coupled with the findings, results, and recommendations by CRA in its Phase I and II reports must be viewed as providing Lexington with sufficient information that, if pursued, would have led to the true condition of the property, is reasonably supported by the record. Accordingly, we are unable to say that the trial court erred in ruling that the information known by Lexington was sufficient to place Lexington on guard and to call for inquiry. See Marin v. Exxon Mobil Corporation, 48 So. 3d at 246; Hogg v. Chevron USA, Inc., 45 So. 3d at 997; Moore v. Chevron USA, 222 So. 3d at 54. Although the testimony by Lexington's experts clearly conflicted with Chevron's evidence, where the trial court's findings are supportable in the record, we may not reverse even though we may have weighed the evidence differently if sitting as the trier of fact. See Rando v. Anco Insulations, Inc., 16 So. 3d at 1082.

In sum, we are bound by the pronouncements of the Supreme Court in Marin v. Exxon Mobil Corporation. Thus, on review, we are constrained to find no manifest error in the trial court's ultimate ruling that Lexington possessed or was

25

deemed to possess knowledge sufficient to trigger the running of prescription on these claims against Chevron in 2005.

**Lexington's Rights Under the Assignment of Claims by the Hoffman Heirs**

In 2012 and 2013, the Hoffman Heirs assigned their claims under the 1959 lease to Lexington, which Lexington asserted in its fifth supplemental and amending petition filed in October of 2013, and which the trial court dismissed as prescribed. On appeal, Lexington contends that the trial court erred in so ruling. Chevron contends that although the trial court was correct in dismissing the assigned claims as prescribed, these claims were also subject to dismissal under the law of this circuit, as the Hoffman Heirs could not have assigned Lexington any rights under the 1959 mineral lease after the retainage acreage rights expired in 2011 and the retained surface rights expired in 2005, as stipulated to by the parties.

In support, Chevron relies on Global Marketing Solutions, L.L.C. v. Blue Mill Farms, Inc., 2013-2132 (La. App. 1st Cir. 9/19/14), 153 So. 3d 1209, 1216, writ denied, 2014-2572 (La. 4/23/15), 173 So. 3d 1164, where this court affirmed the district court's determination that plaintiff had no right to sue the defendants therein based on assignments obtained from mineral servitude owners after the mineral leases expired. Global, which at no time possessed mineral rights to the land, filed suit against former mineral lessees alleging that their operations were polluting the land. This court relied on the principle articulated in Marin and Eagle Pipe that rights and obligations under a mineral lease do not transfer to a third party without assignment in concluding that where the mineral leases were executed and expired before Global purchased the property, Global possessed no real right to pursue damages under the Civil or Mineral Code. Global Marketing Solutions, L.L.C. v. Blue Mill Farms, Inc., 153 So. 3d at 1215-1218 ("Global has no real right of action deriving from ownership of the contaminated property, and neither does Global possess a personal right of action from an assignment.").

26

Thereafter, this court revisited Global on review of a peremptory exception of *res judicata*, in Global Marketing Solutions, L.L.C. v. Chevron U.S.A. Inc., 2018-1765 (La. App. 1st Cir. 9/27/19), 286 So. 3d 1054, 1063, writ denied, 2019-01886 (La. 2/10/20) ___ So. 3d ___, and noted that the issue of whether Global had a right to sue defendants based on assignments obtained from mineral servitude owners after the lease had expired was clearly litigated in Global I and was essential to the district court's dismissal of Global's claims therein.

Chevron further relies on Grace Ranch, LLC v. BP America Production Company, 2017-1144 (La. App. 3rd Cir. 7/18/18), 252 So. 3d 546, 559, writ denied, 2018-1655 (La. 2/18/19), 264 So. 3d 450, which held that where the mineral lease expired before plaintiff obtained assignments, the plaintiff could not have been assigned any rights in the subject lease because "it [is] impossible to transfer rights to an assignee under an expired mineral lease." Grace Ranch, LLC v. BP America Production Company, 252 So. 3d at 559, quoting Lejeune Brothers, Inc. v. Goodrich Petroleum Co., L.L.C., 2006-1557 (La. App. 3rd Cir. 11/28/07), 981 So. 2d 23, 28, writ denied, 2008-0298 (La. 4/4/08), 978 So. 2d 327. Chevron also relies on Boone v. Conoco Phillips Company, 2013-1196 (La. App. 3rd Cir. 5/7/14), 139 So. 3d 1047, 1060, which, relying on Lejeune, likewise found no valid assignment where the plaintiff obtained assignments under an expired lease.[18]

Chevron contends that because Lexington could not have been assigned any rights under the expired 1959 mineral lease, this court should affirm the dismissal of Lexington's assigned claims regardless of whether the assigned contract claims would be subject to a one-year or ten-year prescriptive period. We are constrained

---

[18]This argument was also asserted by Chevron in support of its motion for partial summary judgment as to Lexington's claims for post-acquisition damages and breach of lease, which was denied by the trial court, and is not before us in this appeal. In its written reasons for denying Chevron's motion for partial summary judgment, the trial court held that a right of action to enforce obligations under a lease survives the expiration or termination of the lease. In doing so, the trial court explicitly rejected the decisions in Grace Ranch and Lejeune, finding that they were "non-controlling" and "wholly unsupported by any real legal authority or analysis."

27

to agree. Pretermitting the soundness of the trial court's stated reasons and basis for its ruling, we are constrained to follow Global, which mandates that Lexington has no right to sue defendants based on assignments obtained from mineral servitude owners after the mineral and surface leases expired. See Global Marketing Solutions, L.L.C. v. Blue Mill Farms, Inc., 153 So. 3d at 1216. See also Litel Explorations, L.L.C. v. Aegis Development Company, L.L.C., 2020-373 (La. App. 3rd Cir. 11/12/20), 307 So. 3d 1087, writ denied sub nom., Litel Explorations, L.L.C. v. Apache Development Company, L.L.C., 2020-01428 (La. 2/9/21), 310 So. 3d 184.[19]

## Partial Summary Judgment
### Dismissing Lexington's Pre-Acquisition Claims

In its final two assignments of error, Lexington contends that the trial court erred in granting partial summary judgment dismissing its claims for pre-acquisition damages based on the subsequent purchaser rule.

Appellate courts review motions for summary judgment *de novo*, using the same criteria that govern the trial court's determination of whether the motion should be granted. Thus, the appellate court asks the same questions as the trial court, i.e., whether there is any genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. Jones v. Anderson, 2016-1361 (La. App. 1st Cir. 6/29/17), 224 So. 3d 413, 417.

As set forth above, the subsequent purchaser rule is a jurisprudential rule, which provides that an owner's right to sue for damage to his property is a personal

---

[19]In Litel Explorations, the Third Circuit Court of Appeal rejected the notion that a mineral lessor should be permitted to unilaterally impose an unending restoration obligation far beyond the scope of the mineral lease itself and reiterated its prior holdings in Grace Ranch and Lejeune, i.e., that "the right to sue for pre-acquisition damages is a personal right of action that a subsequent purchaser cannot acquire without an assignment or subrogation of rights." Litel Explorations, L.L.C. v. Aegis Development Company, L.L.C, 307 So. 3d at 1093, citing Grace Ranch, L.L.C. v. B.P. America Production Company, 252 So. 3d at 555. Thus, considering Litel's stipulation that all of the leases terminated prior to its ownership of the property at issue, the court concluded that it is "impossible to transfer rights to an assignee under an expired mineral lease." Litel Explorations, L.L.C. v. Aegis Development Company, L.L.C., 307 So. 3d at 1093, citing Lejeune Brothers, Inc. v. Goodrich Petroleum Co., L.L.C., 981 So. 2d at 28.

28

right held by the person who was the owner at the time the damage was caused. The Supreme Court has held that this personal right is not transferred to a subsequent owner without a clear stipulation that the right has been transferred. Global Marketing Solutions, L.L.C. v. Blue Mill Farms, Inc., 153 So. 3d at 1215, citing Eagle Pipe & Supply, Inc. v. Amerada Hess Corporation, 2010-2267 (La. 10/25/11), 79 So. 3d 246, 256-257, 262. Stated otherwise, an owner of property is deemed to have no right or actual interest in recovering from a third party for damage that was inflicted on the property before his purchase, in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted. Eagle Pipe & Supply, Inc. v. Amerada Hess Corporation, 79 So. 3d at 256-257, 262.[20]

It is undisputed that at the time the motion for partial summary judgment was filed herein, the Hoffman Heirs had not assigned any rights to Lexington. The motion for partial summary judgment, filed by Chevron on April 30, 2009, sought dismissal of Lexington's claims for alleged breach of any express provisions of any mineral or surface lease and for alleged damages that were sustained before Lexington purchased the property on June 10, 2005, based upon the subsequent purchaser rule.[21] Chevron contends that Lexington was neither a lessor nor an assignee of the lessor under the mineral and surface leases, such that there was no privity of contract between Lexington and Chevron necessary to establish a breach of contract, there was no *stipulation pour autrui* in the mineral or surface lease in

---

[20]The "subsequent purchaser rule" blocks suit by the owners of property for damage to property resulting from operations on property prior to acquisition of the property. See 12 La. Civ. L. Treatise, Tort Law § 34:1 (2d ed.).

[21]A motion for partial summary judgment is reviewed on appeal under the law in effect at the time it was filed. See M & R Drywall, Inc. v. MAPP Construction, LLC, 2017-0186, 2017-0187, 2017-0188 (La. App. 1st Cir. 4/29/19), 280 So. 3d 260, 276-277, writs denied, 2019-01325, 2019-01403, 2019-01411 (La. 11/19/19), 282 So. 3d 1073, 1074. We recognize that the motion for partial summary judgment herein was filed prior to the substantial procedural amendment and reenactment of LSA-C.C.P. art. 966 by 2015 La. Acts No. 422, effective January 1, 2016.

favor of Lexington, and the leases contained no express obligation to restore the leased premises.

In opposition, Lexington argues that it had a right of action for remediation of damages sustained prior to its purchase of the property because the right to sue for remediation "follows the land." Lexington contends that it had a right to claim damages as owner of the servient estate burdened by a limited personal servitude, i.e., the 1959 mineral lease. Although it had not been assigned any rights under the mineral lease at that time, Lexington contends it validly acquired a right of action under Louisiana property law when "it acquired the bundle of real rights" constituting surface ownership. Lexington further contends that Louisiana property law accords the surface owner who owns the servient estate the unfettered right to protect his "bundle of real rights" from abuse from the mineral lessee, "who owns the real right constituting the dominant estate." Lexington concedes, however, that at this time, the jurisprudence is not in its favor.

In opposition to the summary judgment, Lexington relies on this court's opinion in Marin v. Exxon Mobile Corporation, 2008-1724 (La. App. 1st Cir. 9/30/09) (unpublished) 2009 WL 7004332, writs granted, 2009-2368, 2009-2371 (La. 2/26/10), 28 So. 3d 262, and aff'd in part, rev'd in part, 2009-2368, 2009-2371 (La. 10/19/10), 48 So. 3d 234. However, our decision in Marin v. Exxon Mobile Corporation was subsequently reversed in part by the Supreme Court, where the Supreme Court determined that where the lease was in effect at the time the Breauxs purchased the property, but was not in effect at the time suit was filed, the Breauxs had no right to sue Exxon as they were not a third party beneficiary to the lease, and the court thus had no need to analyze their rights as subsequent purchasers. Marin v. Exxon Mobil Corporation, 48 So. 3d at 239, 256. The Supreme Court further noted that even *if* the Breauxs were third party beneficiaries

30

to the lease and had a right to sue Exxon under the lease, the action had prescribed. Marin v. Exxon Mobil Corporation, 48 So. 3d at 256.

Lexington also cites Magnolia Coal Terminal v. Phillips Oil Co., 576 So. 2d 475 (La. 1991), which we find distinguishable from the instant case. In Magnolia Coal, the trial court's award of damages for a mineral lessee's failure to restore the surface was based on the finding that the terms of the parties' lease expressly imposed this obligation. As the court noted therein, the "lease impose[d] an express obligation which is a matter of contract not within the purview of the mineral code." Magnolia Coal Terminal v. Phillips Oil Co., 576 So. 2d at 483.

On review, we find that at the time the motion for partial summary judgment was filed herein, the jurisprudence firmly established that the right to sue for damages conferred by a mineral lease is a personal right that does not pass to a subsequent purchaser of property absent an express assignment or subrogation. See Frank C. Minvielle, L.L.C. v. IMC Global Operations, Inc., 380 F.Supp.2d 755, 776 (W.D. La. 2004) (a subsequent purchaser has no standing to raise the prior owner's cause of action against the mineral lessee absent "some form of privity of contract, assignment of rights, or [as] the beneficiary of a stipulation pour autri [sic]"); Lejeune Brothers v. Goodrich Petroleum Co., L.L.C., 981 So. 2d at 29-32, citing Prados v. South Central Bell Telephone Company, 329 So. 2d 744, 751 (La. 1975) (Under Louisiana law, generally a claim for damages to property belongs to the person who owns the property at the time it was damaged. "Under no sound theory can [a claim for damages] be considered as attached to or accessory to the immovable property." A claim for damages, whether it arises under a predial lease or a mineral lease, is a personal right which must be specifically assigned to run with the property. This right can be transferred to the succeeding property owner, but a specific assignment of this right is required to accomplish such a transfer.). See also St. Martin v. Mobil Exploration &

31

Producing U.S., Inc., 224 F. 3d 402, 404, 411 (5th Cir. 2000) (Where a servitude was in effect at the time plaintiff purchased the property, plaintiff was not entitled to deterioration damages resulting from use of that servitude, which occurred prior to his acquisition of the property).

Thus, we are unable to find error in the judgment of the trial court granting Chevron's motion for partial summary judgment as to Lexington's claims for pre-acquisition damages.[22]

Despite our view of the soundness of several of the arguments urged by Lexington, under the law as it presently exists, we are unable to find error in the trial court's ruling that the subsequent purchaser rule precluded Lexington from

---

[22]Although our review is limited to the law in effect at the time the motion was filed, we note that subsequent to the trial court's grant of Chevron's motion for partial summary judgment herein, the subsequent purchaser rule was further interpreted in the jurisprudence by the Louisiana Supreme Court and this court.

In Eagle Pipe, the Supreme Court set forth its analysis of the subsequent purchaser rule. Therein, the Supreme Court granted writs to determine whether a subsequent purchaser of property has the right to sue a third party for non-apparent property damages inflicted before the sale in the absence of the assignment of or subrogation to that right. The Supreme Court determined that the fundamental principles of Louisiana property law compelled it to reach the conclusion that such a right of action is not permitted under the law. Instead, the Court found that the remedy of the subsequent purchaser was to seek rescission of the sale, reduction of the purchase price, or other legal remedies. Eagle Pipe & Supply, Inc. v. Amerada Hess Corporation, 79 So. 3d at 252.

In doing so, the Supreme Court explained the nature of the rights held by the former owner of the property, which continue to exist after the owner's disposal of the property, as follows:

> The property owner at the time the damages were inflicted has a personal right of action against the tortfeasor for the disturbance of his real right in the property. When the damage is apparent, the property owner obtains the personal right of action to sue for damages to compensate for a loss of value in the property or an interference with the property's use. This personal right exists during his use and enjoyment while he owns the property. This personal right exists even during and after his disposal of the property, as it is assumed the apparent damage would result in a loss of value to the property which would be reflected in the sale price. Where damage to the property is not apparent, and the property has been sold, the law provides the purchaser with the right to seek rescission of the sale or a reduction in the purchase price. In that instance, the former owner's right to dispose of the property without disturbance has been affected, as the owner must now defend against an action in redhibition or take some other action to repair, remedy or correct the defect.

Eagle Pipe & Supply, Inc. v. Amerada Hess Corpation, 79 So. 3d at 275.

The subsequent purchaser rule was interpreted and applied by this court in Global Marketing Solutions, L.L.C. v. Blue Mill Farms, Inc., 153 So. 3d at 1209, where this court, relying on the principles articulated by the Supreme Court in Marin and Eagle Pipe, affirmed the trial court's determination that plaintiff had no right to sue defendants based on assignments obtained from mineral servitude owners after the mineral leases expired.

asserting claims for damages sustained prior to its purchase of the property. Thus, the November 16, 2009 judgment of the trial court granting Chevron's motion for partial summary judgment is affirmed.

## CONCLUSION

For the above and foregoing reasons, the November 12, 2019 judgment of the trial court is affirmed. Costs of this appeal are assessed to the appellant, Lexington Land Development, L.L.C.

**AFFIRMED.**